**UNITED STATES of America**

v.

**LANSDOWNE SWIM CLUB, Appellant.**

**No. 89–1616.**

United States Court of Appeals, Third Circuit.

Submitted Jan. 12, 1990.

Decided Jan. 25, 1990.

Rehearing and Rehearing In Banc Denied Feb. 22, 1990.

84

Jeffrey L. Pettit, Hepburn, Willcox, Hamilton & Putnam, Philadelphia, Pa., for appellant.

Marie K. McElderry, David K. Flynn, U.S. Dept. of Justice, Washington, D.C., for appellee.

Before GIBBONS, Chief Judge *, SCIRICA, Circuit Judge, and BLOCH, District Judge **.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal is taken from the judgment of the district court, after a non-jury trial, that the Lansdowne Swim Club (LSC) discriminated against blacks on the basis of race or color in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–2000a–6 (1982). LSC challenges the findings of the district court on three grounds: that it is an exempted private club, that it is not a place of public accommodation, and that the United States failed to prove a pattern or practice of racial discrimination. We will affirm the judgment of the district court.

### I.

Because the district court opinion thoroughly sets forth the facts, *United States v. Lansdowne Swim Club*, 713 F.Supp. 785 (E.D.Pa.1989), we shall only summarize them here. LSC, a nonprofit corporation organized under the laws of Pennsylvania, is the only group swimming facility in the Borough of Lansdowne, Pennsylvania. Since its founding in 1957, LSC has granted

* Chief Judge Gibbons participated in the consideration of this appeal but retired prior to the entry of judgment.

** The Honorable Alan N. Bloch, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1400 full family memberships. Every white applicant has been admitted, although two as limited members only. In that time, however, LSC has had only one non-white member.

The uncontroverted experiences of the following Lansdowne residents are significant. In 1976, the Allisons wrote to LSC requesting an application but LSC did not respond. Dr. Allison is black; his three children are part-black. In 1977, the Allisons twice again wrote for an application but LSC did not respond. The following year, the Allisons repeated the procedure with similar results. In 1983, the Allisons filed a timely application and otherwise qualified for membership but were rejected. The following year, the Ryans filed a timely application and otherwise qualified for membership. Nonetheless, they were rejected. Two of the Ryans' adopted children are black. The Ryans then complained to the media and picketed LSC, joined by the Allisons. In 1986, the Iverys, who are black, filed a timely application and otherwise qualified for membership. Nonetheless, they were rejected (as were the Ryans and Allisons who had again applied).

The United States commenced this action against LSC on May 18, 1987.[1] The complaint alleges that LSC is a place of public accommodation within the meaning of Title II, which has engaged in a pattern or practice of discrimination by refusing membership to blacks because of their race or color, in violation of Title II. On May 10, 1989, following a non-jury trial, the district court filed its findings of fact and conclusions of law. The court concluded that LSC is not exempt from Title II as a private club under 42 U.S.C. § 2000a(e), that it is covered by Title II as a place of public accommodation under 42 U.S.C. § 2000a(b)(2), (3) and (4), and that it has engaged in a pattern or practice of racial discrimination in violation of Title II, 42 U.S.C. § 2000a–5(a). On June 20, 1989, the district court entered a broad injunctive order to remedy the situation. This appeal followed.

We have jurisdiction under 28 U.S.C. § 1291 (1982).[2] We review findings of fact under the clearly erroneous standard. Fed. R.Civ.P. 52(a). To the extent that we review the application of the law to the facts, our review is plenary. *Petrella v. Kashlan*, 826 F.2d 1340, 1343 (3d Cir.1987).

## II.

▮ LSC's first argument is that it is a private club. Under Title II, "a private club or other establishment not in fact open to the public" is exempt from the statute. 42 U.S.C. § 2000a(e). LSC has the burden of proving it is a private club. *See Anderson v. Pass Christian Isles Golf Club, Inc.*, 488 F.2d 855, 857 (5th Cir.1974). Although the statute does not define "private club", cases construing the provision do offer some guidance.[3] The district court distilled eight factors from the case law as relevant to this determination, three of which it found dispositive of LSC's public nature: the genuine selectivity of its membership process, *e.g., Tillman v. Wheaton Haven Recreation Ass'n*, 410 U.S. 431, 438, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973), its history, *e.g., Cornelius v. Benevolent Protective Order of Elks*, 382 F.Supp. 1182, 1203 (D.Conn.1974), and use of its facilities by nonmembers, *id.* Appellant disputes these findings.

First, the court concluded that LSC's membership process was not genuinely selective. Essential to this conclusion was the court's finding that "LSC possesses no objective criteria or standards for admission." The court identified four "criteria" for admission to LSC: being interviewed, completing an application, submitting two

1. The Attorney General is authorized to bring this action by 42 U.S.C. § 2000a–5(a).

2. The district court had jurisdiction pursuant to 42 U.S.C. § 2000a–6(a) and 28 U.S.C. § 1345 (1982).

3. LSC asserts that we should apply the Equal Employment Opportunity Commission's definition of "bona fide private membership club" under § 701(b)(2) of Title VII, 42 U.S.C. § 2000e(b)(2) (1982). We agree with the district court that the proper standard is set forth in the "private club" case law under Title II.

letters of recommendation and tendering payment of fees. We agree, and LSC apparently concedes, that these criteria were not genuinely selective.[4] Nonetheless, LSC challenges the court's failure to consider membership approval a criterion for admission. We agree with the district court, however, that a formal procedure requiring nothing more than membership approval is insufficient to show genuine selectivity. *See Tillman,* 410 U.S. at 438–39, 93 S.Ct. at 1094–95. In addition, LSC stipulated that the only information given to the members prior to the membership vote is the applicants' names, addresses, their children's names and ages, and the recommenders' identities. In such a situation, the court was correct to conclude that LSC "provides no information to voting members that is useful in making an informed decision as to whether the applicant and his or her family would be compatible with the existing members." Therefore, even if membership approval were considered a fifth criterion, it would not make the process any more genuinely selective in this case.

The district court also found the yields of the membership process indicative of lack of selectivity. Since 1958, LSC has granted full memberships to at least 1400 families while denying them to only two non-black families. LSC contends that emphasizing the few instances of non-black applicant rejection "misconstru[es] the significance of selectivity. The crucial question should be whether the members exercised their right to be selective rather than the statistical results of the exercise of that right." As the Court of Appeals for the Fourth Circuit noted a decade ago, formal membership requirements "have little meaning when in fact the club does not follow a selective membership policy." *Wright v. Salisbury Club, Ltd.,* 632 F.2d 309, 312 (4th Cir.1980) (citing *Tillman,* 410 U.S. at

438–39, 93 S.Ct. at 1094–95). We find the evidence of lack of selectivity convincing.

Second, the court concluded that "the origins of LSC suggest that it was intended to serve as a 'community pool' for families in the area and not as a private club." We believe there was ample evidence to support this finding. A founder of LSC testified that LSC was created as a community pool for the neighborhood children. LSC's stipulations confirm the public nature of the facility: organizers solicited Lansdowne-area residents, conducted public recruitment meetings and accepted every family that applied for membership before opening.

Third, the court concluded that use of the facility by non-members "undercut LSC's claim that it is a private club." Among other reasons, the court cited the following factors. LSC hosts several swim meets and diving meets each year but does not prohibit the general public from attending. LSC also sponsors two to four pool parties each year, for which members and associates may sell an unlimited number of tickets to persons who are not members. In addition, LSC's basketball and volleyball courts, located on its parking lot, are open to the public. Finally, LSC permits the local Boys' Club to use its parking lot for an annual Christmas tree sale that is open to the public. Although LSC contends such use is de minimus, we are persuaded otherwise.

### III.

LSC also contends that it is not a "place of public accommodation" as defined in Title II. Under the statute, a place of public accommodation has two elements: first, it must be one of the statutorily enumerated categories of establishments that serve the public,[5] 42 U.S.C. § 2000a(b); second, its operations must affect commerce, *id.*

---

**4.** The interview is not probing. Its sole purposes are to describe LSC and its membership procedures and to verify the names and ages of children in the applicant's family. Moreover, the application seeks only basic information: applicants are not investigated as to their financial condition, credit history, employment status, educational background, club affiliations or criminal record.

**5.** Title II, in part, provides:
(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this

## A.

█ The district court concluded that the whole complex, both the recreational areas and the snack bar, was an establishment which served the public. The court began by identifying LSC as a "place of ... entertainment", one of the categories of covered establishments. "LSC concedes that its swimming and other recreational areas make it an 'establishment' ", but maintains that the snack bar is not a covered establishment. The district court held that "bifurcation has no support in the plain language of the Act or the case law interpreting it." Under the facts in this case, we agree. Nonetheless, the court also found the snack bar to be a "facility principally engaged in selling food for consumption on the premises", another category of covered establishments. LSC stipulated that "food for consumption on the premises of the Club is sold" at the snack bar. We believe these findings were sufficient to render the entire facility a covered establishment which serves the public.

## B.

█ The district court also concluded that the "affecting commerce" requirement was met. Initially, the court discussed the recreational areas, which it correctly deemed a place of entertainment under § 2000a(b)(3). Under Title II, the operations of a place of entertainment affect commerce if "it customarily presents ... sources of entertainment which move in commerce".[6] *Id.* § 2000a(c)(3). The court found the sliding board, manufactured in Texas, and guests from out of state to be sources of entertainment which moved in commerce. *See Scott v. Young*, 421 F.2d 143, 144–45 (4th Cir.) (both recreational apparatus originating out of state and pa-

trons from out of state who entertain other patrons by their activity constitute "sources of entertainment which move in commerce") (relying on *Daniel v. Paul*, 395 U.S. 298, 307–08, 89 S.Ct. 1697, 1702–03, 23 L.Ed.2d 318 (1969)), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). Implicitly conceding this, LSC argues that they do not satisfy "the requisite degree of interstate involvement." Nonetheless, the court found both to be "customarily presented", the sliding board because it is permanently installed, and the out of state guests because they attend regularly and constitute a significant percentage of the guests (13% in 1986, 8% in 1987). We believe these findings, and the court's consequent finding that operation of the recreational areas affects commerce, are supported by the evidence.

█ The court then considered the snack bar, which it correctly deemed a facility principally engaged in selling food for consumption on the premises under § 2000a(b)(2). Under Title II, the operations of this category of covered establishments affect commerce if "it serves or offers to serve interstate travelers or a substantial portion of the food which it serves ... has moved in commerce". *Id.* § 2000a(c)(2). The court found the "affecting commerce" requirement satisfied in three ways. First, it was stipulated that the snack bar serves interstate travelers. Although LSC contends that the statute is meant to cover tourists lured from other states by advertising, the plain language of the statute provides no support for this view. Second, the court found that the snack bar offers to serve all users of the facility, including guests. Third, the court found that a substantial portion of the food served by the snack bar has moved in inter-

---

subchapter if its operations affect commerce ...

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises....

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment.

(4) any establishment (A)(i) which is physically located within the premises of any estab-

lishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

**6.** Title II defines "commerce" as "travel, trade ... [or] transportation ... among the several States...." 42 U.S.C. § 2000a(c).

state commerce. The parties stipulated that the syrup used in the "Coca–Cola" beverages was produced in Maryland. The court found that many of the purchases at the snack bar were for cold drinks, of which "Coca–Cola" beverages were the most popular. Nonetheless, appellant claims the substantiality test has not been met, citing *Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), in which the Supreme Court found the test met when three of the four foods sold had moved in interstate commerce. *Id.* at 305, 89 S.Ct. at 1701. In light of the broad remedial purpose of Title II, we refuse to read the requirement or *Daniel* so narrowly. These findings are not clearly erroneous.

### IV.

■ Finally, LSC maintains that the United States did not sustain its burden of proving that LSC engaged in a pattern or practice of discrimination against blacks. *See* 42 U.S.C. § 2000a–5(a). To succeed on the merits, the United States must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [must] establish by a preponderance of the evidence that racial discrimination was [LSC's] standard operating procedure—the regular rather than the unusual practice." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1854–55, 52 L.Ed.2d 396 (1977). The following allocation of burdens and order for presenting proof obtains:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimina-

tion. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [applicant's] rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)).[7]

### A.

To make out a prima facie case, the United States had to prove that qualified blacks applied for membership when LSC was seeking applicants but were rejected, and that non-black applicants subsequently obtained memberships.[8] *Cf. McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *cf. also Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. Satisfying this test should not be onerous.[9] *Id.*

The district court found the repeated rejections of three qualified black applicants highly probative of a pattern or practice of discrimination. According to LSC, the court's finding resulted from certain errors. With respect to the rejections of the Allisons in 1983 and the Ryans in 1984, LSC asserts that the government adduced no evidence that the voting members knew that members of these families were black.

7. The law cited here relates to actions under Title VII, not Title II. As the district court noted, however, both provisions require proof of a "pattern or practice", *compare* 42 U.S.C. § 2000e–6 (1982) *with id.* § 2000a–5, and the legislative history of the Civil Rights Act indicates that the phrases have the same meaning, *see* 110 Cong.Rec. 14,270; *id.* at 14,239. At least one Court of Appeals has approved such use of Title VII law, although on different facts. *See Hornick v. Noyes,* 708 F.2d 321, 325 & n. 8 (7th Cir.1983), *cert. denied,* 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984); *cf. Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1340–41 (2d Cir.1974); *Dean v. Ashling,* 409 F.2d 754,

756 (5th Cir.1969). The parties concur in this analysis and neither challenges it on appeal.

8. LSC repeats its argument that membership approval should be included as a fifth criterion. We disagree. If "qualified" means being approved, i.e., not being rejected, then a plaintiff can never show both qualification and rejection, essential and independent elements of a prima facie case.

9. As we noted, these standards are adapted from Title VII cases. The parties agree on their applicability and neither challenges them on appeal.

Moreover, LSC asserts that the simultaneous acceptance of a part-black family and the rejection of a white family affirmatively proves that there was no discrimination. LSC reiterates its simultaneous rejection theory to discount the 1986 rejection of the Iverys.

We acknowledge that the district court made no specific finding on the voting members' knowledge of the Allisons' race. Nonetheless, we believe such knowledge easily could be inferred from the stipulation that the Allisons, several years earlier, had filed a racial discrimination complaint against LSC with the Pennsylvania Human Relations Commission. As to the Ryans, on the other hand, the district court specifically found awareness by the voting members of the children's race. This finding was based on the family's interview and Mrs. Ryan's subsequent call to the interviewer regarding minority members. Clearly, this constitutes sufficient evidence.

Furthermore, we do not find clearly erroneous the finding on membership evidence. As the district court stated, in response to evidence that one part-black was admitted, we need not find that LSC always discriminated to find that it engaged in such a pattern or practice. Nor does the rejection of a white family ameliorate matters. Indeed, during LSC's thirty-year history, every non-black applicant—even the rejected family alluded to above—has obtained membership at some time.

The district court also found that events occurring before the current membership policies were promulgated were probative of LSC's pattern or practice of discrimination against blacks. LSC argues that the findings are not supported by the evidence.[10] We disagree. First, the court found discrimination in the organization of

LSC. LSC points out that, at the time LSC was founded, blacks largely resided on the opposite side of town and blacks were founding a similar organization. Nonetheless, these circumstances do not obviate the fact that LSC never solicited blacks in Lansdowne, even when the anticipated draw of members from the Borough failed to materialize. Second, the court found LSC's deterrence of four applicants known to be black,[11] by ignoring their membership inquiries, to be a critical component of its discriminatory practice. The court's finding that the inaction was intended to deter and probative of a discriminatory practice is supported by the evidence.

### B.

Assuming the government sustained its burden, LSC contends that it successfully rebutted the consequent presumption of a pattern or practice of discrimination. According to LSC, the district court erroneously rejected two nondiscriminatory motives for denying the applicants, namely failure to gain membership approval and refusal to embrace applicants charging it with racism.[12] We find no error. The former reason states, in essence, "We rejected you because we did not approve you." Not only is it circular but also it improperly insulates the voting process from the court's probe for racial animus. The latter, of course, is inextricably related to the race of the applicants.

### C.

The court did accept some of the motives offered by LSC as racially nondiscriminatory. These motives reflected a stated desire not to associate with the applicants because of certain of their affiliations, namely fair housing and teenage pregnancy programs on the part of the Allisons, and the United

---

**10.** LSC also argues that the events are too remote in time to be probative. We disagree. When such wide-ranging violations are averred, the entire operation must be considered.

**11.** There was no evidence that LSC knew the race of one inquirer, Inez Parker. Based on the general deterrence evidence, however, the district court found such knowledge. This was not clearly erroneous.

**12.** LSC also criticizes the district court's finding that the race of all unidentified applicants was white, and contends this effectively required it to prove its nondiscriminatory motives. While this may have been the effect, we believe the district court's finding was amply supported by the evidence. At least six witnesses testified that they were unaware of any black members of the club. The one non-white member mentioned above is a part-black youth.

Farm Workers and Roman Catholic religious orders on the part of the Ryans. Nonetheless, the court found all of these motives pretextual. LSC asserts that the court based its finding on a lack of evidence that a sufficient number of voting members shared the dissociative sentiments, and thus impermissibly shifted the burden to LSC. To the extent the court did so, we agree that it improperly shifted the burden. However, because the district court also found affirmative proof of pretext, we find no error here. The court found LSC's repeated failure to respond to the Allisons' previous membership requests probative of racially motivated rejection. This conclusion is supported by the evidence. Also, the court found that the Ryans were not generally known in the community and had not participated in the "objectionable" activities in the Lansdowne area. Clearly, the court could find that the voting members were not swayed by the Ryans' participation in such activities.

### V.

We have considered LSC's other contentions and find them to be without merit. The district court has thoroughly examined the evidence and set forth with care its findings of fact and conclusions of law. We will affirm its judgment.

Costs taxed against appellant.