Merrimack
No. 2002-571

FRANKLIN LODGE OF ELKS

v.

SALLY MARCOUX & a.

Argued: March 5, 2003
Opinion Issued: June 13, 2003

*Seufert Professional Association,* of Franklin (*Christopher J. Seufert* on the brief and orally), for the petitioners.

*Matthew J. Lahey, P.A.*, of Laconia (*Matthew J. Lahey* on the brief and orally), for the respondent.

BRODERICK, J. The respondent, Franklin Lodge of Elks (Franklin Lodge or Lodge), appeals from an order of the Superior Court (*McGuire*, J.) affirming a decision of the New Hampshire Commission for Human Rights (commission) which awarded the petitioners, Sally Marcoux, Terry Bergeron-Hoyt, Renee LaBonte and Joann LaBonte, compensatory damages for the Lodge's discrimination against them. *See* RSA 354-A:17 (Supp. 2002). We affirm.

I

The following facts are undisputed. Franklin Lodge is a local chapter of a nationwide benevolent organization which raises money to donate to various charities. During the relevant time frame, the national organization had 2,000 lodges with a total membership of almost 1,200,000. Franklin Lodge had approximately 622 members, none of whom was a woman, and was located in a community with a population of more than 8,000.

The Lodge conducts various social and fund-raising activities throughout the calendar year. It sponsors weekly bingo games that are open to the public, and leases its premises to members for private functions (such as wedding receptions) and to various organizations for special events. It also operates an on-site bar and grill where members can purchase food and alcoholic beverages for themselves and their guests. According to Lodge policy, a guest can visit the bar and grill three times but then must be encouraged to apply for membership.

Membership dues generated approximately $30,000 in 1996. The Lodge's annual budget in the same year was $148,000, which included its fixed, administrative and maintenance expenses. Thus, the Lodge's financial survival depended upon the revenue generated from its various commercial activities. For example, in 1996, the weekly bingo games brought in more than $10,000, while the bar and grill sales generated $43,000 in income. To accomplish its various activities, the Lodge relied upon the Emblem Club, a "women's auxiliary" organization it sponsored comprised primarily of the wives of Lodge members. Club members also volunteered their time to the Lodge activities, including fund-raising.

To qualify for membership in the Lodge, an individual must be a citizen of the United States, believe in God, be at least twenty-one years of age, be of good character and not be a Communist. Formerly, membership was limited to men, but in 1995, the national organization removed the gender barrier. The national Elks organization maintains a home page on the

Internet informing interested parties how to locate a local lodge and apply for membership. Applications to a local lodge are reviewed by a committee which interviews each candidate and makes recommendations on admission. Thereafter, the local lodge members vote to accept or reject the applicants for membership. Initially, all applicants appear on a block ballot. If the block ballot is rejected, then single ballots are presented for each individual candidate. A two-thirds majority is necessary to approve an applicant for membership.

In 1997, the petitioners applied for membership in the Franklin Lodge after having served as Emblem Club members for several years. The investigating committee approved their applications. In April 1997, a block ballot containing their names, along with that of one other woman and five men, was presented to the membership. The block was rejected. After individual ballots were distributed, the five men were accepted while the five women were rejected. A subsequent ballot for the women was again unsuccessful. During this time frame, several Lodge members expressed substantial resistance to women becoming members and made lewd, demeaning, sexually explicit remarks to and about the petitioners.

The petitioners filed charges with the commission alleging unlawful gender discrimination by a place of public accommodation. *See* RSA 354-A:17. After conducting a public hearing, the commission ruled that Franklin Lodge was a place of public accommodation and that it failed to prove that it qualified for an exemption as a "distinctly private" organization. *See* RSA 354-A:2, XIV (Supp. 2002). It determined that the Lodge had engaged in unlawful gender discrimination by denying membership to the petitioners and had subjected them to ongoing verbal and sexual harassment by the actions of several of its members. It awarded each petitioner $10,000 in compensatory damages, along with reasonable and necessary attorney's fees and costs. *See* RSA 354-A:21, II(d) (Supp. 2002). It also ordered the Lodge to pay $24,000 in administrative fines. *See id.*

The Lodge appealed the commission's decision to the superior court. *See* RSA 354-A:22 (Supp. 2002). Because the Lodge did not challenge the commission's factual findings, the court reviewed only issues of law and affirmed the commission's decision. This appeal followed.

II

The Lodge argues that its organization does not fall within the scope of the public accommodations law, that the compensatory damages awarded were unsupported by the evidence and erroneous as a matter of law, and that our State Constitution limits each petitioner's damages to $1,500. We address each argument in turn.

Under New Hampshire law, a place of public accommodation is prohibited from discriminating against individuals based upon specific characteristics, including gender, with respect to the accommodations, advantages, facilities or privileges it provides. RSA 354-A:17. The purpose of the law is to ensure that publicly offered goods and services, such as those of a hotel or restaurant, are available to individuals regardless of gender or other protected characteristics. RSA 354-A:1 (Supp. 2002). To be subject to the statute's proscriptions, an organization or establishment must be a "place of public accommodation." *See* RSA 354-A:17. That term is defined to include a nonexclusive list of entities, such as hotels, barbershops, restaurants and golf courses, as well as any "other establishment[s] which cater[] or offer[] [their] services or facilities or goods to the general public" (catch-all category). RSA 354-A:2, XIV. The statute provides, however, that "[p]ublic accommodation shall not include any institution or club which is in its nature distinctly private." *Id.* (quotation omitted).

The Lodge does not contest that it denied membership to the petitioners based solely upon their gender. It advances several arguments, however, challenging its status as a "place of public accommodation." First, it contends that it is not similar to the entities specifically listed in the "place of public accommodation" definition and that the catch-all category does not extend to membership in a club or organization. Next, it claims that its organization falls within the "distinctly private" exemption. Finally, it argues that it is not a "place of public accommodation" for purposes of the discriminatory conduct charged by the petitioners. This last argument asks us to treat the Lodge as a bifurcated entity; that is, a place of public accommodation for activities open to the general public (*e.g.*, bingo games), but a "distinctly private" organization for activities exclusive to members (*e.g.*, access to the bar and grill and voting on Lodge matters like membership).

When construing the meaning of a statute, we are the final arbiter of the legislature's intent. *Appeal of Estate of Van Lunen*, 145 N.H. 82, 86 (2000). We begin our task by examining the language of RSA 354-A:2, XIV, and ascribing the plain and ordinary meaning to the words used by the legislature. *Id.* We do not consider words and phrases in isolation, however, but within the context of the statute as a whole. *Pennelli v. Town of Pelham*, 148 N.H. 365, 366 (2002). This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. *Id.* Indeed, "it is especially appropriate to consider the evil or mischief the statute was designed to remedy." *Rix v. Kinderworks Corp.*, 136 N.H. 548, 550 (1992) (quotation omitted). Because the interpretation of a statute is a

question of law and no facts are disputed in this case, we review the trial court's decision *de novo. See Pennelli,* 148 N.H. at 366.

■ We first address whether the statutory definition of "place of public accommodation" is intended to reach the membership practices of an organization like the Lodge. We acknowledge that the Franklin Lodge, as a membership organization, is not easily analogized to the array of entities specifically listed in RSA 354-A:2, XIV, which are essentially commercial enterprises like a hotel or sports arena, more commonly understood as offering patronage to the general public. *See* RSA 354-A:2, XIV. When considering, however, whether the Lodge falls within the catch-all category of an establishment that "caters or offers its services or facilities or goods to the general public," we are mindful of the legislative directive to broadly interpret the statutory scheme to effectuate its purpose. *See* RSA 354-A:25 (1995). The only limiting language on this otherwise expansive category is the exclusion of entities which by their nature are "distinctly private." This exemption demonstrates the legislature's intent to preserve nondiscriminatory access to ostensibly private organizations that otherwise offer their facilities, services or goods to the general public. *See Lahmann v. Fraternal Order of Eagles,* 43 P.3d 1130, 1135 (Or. Ct. App.), *review denied,* 54 P.3d 1041 (Or. 2002) (use of "distinctly private" language reflects legislature's recognition that some ostensibly private organizations have such unrestrictive membership criteria that they are effectively public). Therefore, we reject the Lodge's argument that the public accommodations statute cannot reach the membership practices of an organization claiming a private status.

We next consider whether the Lodge falls within the definition of "place of public accommodation" or whether it is a "distinctly private" entity. This inquiry requires us to review the parameters of the public accommodations law for the first time. Similar public accommodations laws, however, have been enacted in many other States and federally. *See, e.g.,* N.J. Stat. Ann. §§ 10:5-3, :5-4, :5-5(1), :5-12(f) (West 2002); Mich. Comp. Laws Ann. §§ 37.2301, 37.2302, 37.2303 (West 2001); Wash. Rev. Code. §§ 49.60.010, 49.60.040(10) (2002); 42 U.S.C. §§ 2000a(a), (b), (e) (1999). Substantial case law exists at both the state and federal level concerning whether membership organizations, like the Lodge, constitute places of public accommodation or private entities exempt from a particular public accommodations statute. *See, e.g., Barry v. Maple Bluff Country Club, Inc.,* 629 N.W.2d 24, 27-28 (Wis. Ct. App.), *review denied,* 635 N.W.2d 782 (Wis. 2001); *Lahmann,* 43 P.3d at 1132; *United States v. Lansdowne Swim Club,* 894 F.2d 83, 85 (3d Cir. 1990). Because our public accommodations statute is sufficiently similar to those of many States and the federal civil

rights statute, we look to foreign case law for guidance. We pay particular attention to those cases which address the discriminatory membership practices of ostensibly private organizations.

■■ When assessing whether a membership organization constitutes a place of public accommodation rather than an exempt private entity, several factors are commonly considered: (1) whether its membership is genuinely selective; (2) its control over its operations; (3) its history; (4) the use of organization facilities by nonmembers; (5) its purpose; (6) whether it advertises for members; (7) whether it maintains a nonprofit status; and (8) the formalities it observes. *See Barry*, 629 N.W.2d at 27-28; *United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 796-97 (E.D. Pa. 1989), *aff'd*, 894 F.2d 83 (3d Cir. 1990). While we acknowledge this framework to be sound, circumstances may dictate consideration of other factors as well. *See Eagles v. Grand Aerie of Fraternal Order*, 59 P.3d 655, 669 (Wash. 2002), *cert. denied*, 123 S. Ct. 2221 (2003). We agree with those jurisdictions that place the greatest weight upon whether membership is truly selective in discerning whether a membership organization is actually private. *United States v. Trustees of Fraternal Order of Eagles*, 472 F. Supp. 1174, 1175 (E.D. Wis. 1979). "The essence of privacy is selectivity. If there is little or no selectivity, there is no basis to claim privacy." *Rogers v. International Ass'n of Lions Clubs*, 636 F. Supp. 1476, 1480 (E.D. Mich. 1986). Thus, the genuine selectivity factor alone can be conclusive when an organization wholly lacks exclusivity. *See Concord Rod and Gun Club, Inc. v. MCAD*, 524 N.E.2d 1364, 1367 (Mass. 1988).

We turn then to applying the eight-factor test to the undisputed facts of this case. The Lodge contends that the first, second, fourth and fifth factors demonstrate its "distinctly private" nature.

■ With respect to the genuine selectivity factor, we acknowledge that the Lodge has particular membership criteria, as earlier described, and an apparently formal procedure for screening and accepting applicants seeking membership. In reality, however, virtually all men who apply and satisfy minimum standards are admitted. Membership criteria are insufficient to establish selectivity where they do not function as true limits on admission. *See Lansdowne*, 894 F.2d at 86. Here, there are no findings by the commission which demonstrate actual selectivity in Lodge membership. Indeed, other courts reviewing similar membership criteria have determined that they failed to insure sufficient selectivity. *See Eagles*, 59 P.3d at 671-72; *Elks Lodges 719 & 2021 v. Alcoh. Bev. Con.*, 905 P.2d 1189, 1199 (Utah 1995), *cert. denied*, 517 U.S. 1221 (1996); *Trustees of Fraternal Order of Eagles*, 472 F. Supp. at 1176.

Turning to the Lodge's particular criteria, no findings were made that excluding Communists and requiring United States citizenship would present much of a barrier to the pool of candidates in the Franklin area from which the Lodge draws its membership. Likewise, the commission's findings show that the "good character" criteria and investigation process constitute perfunctory scrutiny rather than true selection. *See Lansdowne Swim Club*, 894 F.2d at 86 (formal membership requirements have little meaning where club does not follow selective membership policy).

Further, while an acceptable candidate must profess a belief in God, there is no required affiliation with any religious denomination or sect or required participation in any particular religious practice or ritual. *Cf. Kiwanis Intern. v. Ridgewood Kiwanis Club*, 806 F.2d 468, 475 (3d Cir. 1986), *cert. dismissed*, 483 U.S. 1050 (1987) (members required to participate in prayer and recite pledge of allegiance). Moreover, "[t]here are countless individual interpretations of . . . 'God' . . . or what it means to 'believe in God,'" *Welsh v. Boy Scouts of America*, 742 F. Supp. 1413, 1426 (N.D. Ill. 1990), *aff'd*, 993 F.2d 1267 (7th Cir.), *cert. denied*, 510 U.S. 1012 (1993), and thus, without some qualification or other particular prescription, the Lodge's requirement that candidates believe in God "is scarcely a restrictive [one]," *id.*

■ Finally, the sheer size of the Lodge's membership discredits any claim of selectivity. The national Elks organization requires local lodges to maintain a minimum of twenty-five members and there is no evidence that any size limitation controls the growth of local chapters. The Franklin Lodge had over 600 members in 1996. *Compare Kiwanis Intern.*, 806 F.2d at 470, 478 (private club of 28 members was exclusive) *with Roberts v. United States Jaycees*, 468 U.S. 609, 621 (1984) (club having over 400 members constituted "large and basically unselective group"); *see also Rogers*, 636 F. Supp. at 1479. In sum, "truly selective membership requires a plan or purpose of exclusiveness," *Barry*, 629 N.W.2d at 28 (quotation omitted), and the findings made by the commission conclusively demonstrate that the Lodge maintains an inclusive and expansive practice of admitting applicants to membership. Therefore, we conclude that the genuine selectivity factor weighs against the Lodge's claim of having a "distinctly private" character.

We next examine the Lodge's practice of permitting nonmembers to use its facilities and access its services and goods. In this context, we address the Lodge's argument that it should be treated as a bifurcated entity. The Lodge acknowledges that it opens its facility to the general public for social and fund-raising activities, such as bingo and circuses, and that it is obligated to permit access to these events without discrimination in

accordance with RSA chapter 354-A. It distinguishes its public functions, however, from its members-only activities. It contends that only members may hold office, attend meetings, vote, enter the Lodge facility with a membership card, and rent the facility for non-Lodge functions, and that nonmembers may enter the Lodge and participate in functions only as guests of a member. We conclude that, even assuming a bifurcated status could be supported by the statutory definition of "place of public accommodation," such distinction is not supported under the facts of this case. *See Lansdowne*, 894 F.2d at 87.

Certainly, members of the Lodge had unfettered access to its facility as well as the services and goods provided by the bar and grill. Further, only members participate in voting and other internal operations of the Lodge. The Lodge fails to consider, however, that membership itself is essentially available to the general public. Because of the largely unselective and inclusive nature of the membership requirements and the associated review process, there is little substantive difference between the Lodge's social and fund-raising events held open to the general public and its members-only activities, except that the latter group consists of those who make the minimal effort required to secure Lodge membership. Furthermore, the Lodge opens its bar and grill to guests of members, which runs decidedly counter to the notion that its bar and grill activities are somehow exclusive or private and thus distinct from its public functions. *Cf. Commonwealth, Hum. R. Com'n v. Loyal Ord. of Moose*, 294 A.2d 594, 598 (Pa. 1972).

Moreover, we find it significant that in 1996, the very existence of the Lodge wholly depended upon its commercial interaction with the public. The commission expressly found that "[w]ithout revenue brought in from commercial enterprises such as Bingo, Lucky-7, and its [bar and grill], the respondent would not be able to maintain the Lodge." Therefore, we conclude that the public's regular access to the Lodge's facility, goods and services during social and fundraising events and its substantial financial dependency upon commercial interaction with the public demonstrate the Lodge's public nature.

The remaining factors relied upon by the Lodge to establish its distinctly private nature require only brief attention. The Lodge is a benevolent organization which raises money to donate to various charities for the public good. There are no factual findings, nor does the Lodge contend, that it focused its efforts on advancing a particular private cause or purpose related to its membership body. Moreover, to accomplish its charitable purpose, the Lodge relied heavily upon the volunteer services of Emblem Club members. *Roberts*, 468 U.S. at 621 (membership

organization not private where, *inter alia,* "much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship"). Finally, even assuming that the Lodge controls its organization through a hierarchical authority coupled with specific rules and procedures, this factor does not outweigh the other factors that strongly support a non-private status.

## III

The Lodge also contends that the compensatory damages awarded to the petitioners for emotional harm were not supported by the evidence and were erroneous as a matter of law. It argues that the rule in *Thorpe v. State,* 133 N.H. 299, 305 (1990), requiring expert proof of physical manifestations of emotional distress caused by a defendant's negligent conduct, applies to this case.

The public accommodations statute authorizes the commission to award compensatory damages upon a finding of unlawful discrimination. RSA 354-A:21(2)(d) (Supp. 2002). The commission's ruling that the Lodge engaged in such activity was based upon the statute's provision which prohibited the Lodge from "directly or indirectly, ... refus[ing], withhold[ing] from or deny[ing] to [a protected] person any of the accommodations, advantages, facilities or privileges thereof." RSA 354-A:17. The plain language of this provision, standing alone, suggests that a complainant must show intentional misconduct in order to prevail. Even if negligent conduct arguably were sufficient, however, the unlawful discrimination in this case was clearly intentional.

Several Lodge members remarked before their vote on the petitioners' applications that "they were going to make sure no women were accepted [and] that the Elks was a 'man's club.'" Further, the Lodge's Exalted Ruler admitted that "the women were denied membership solely because of their gender," and testified that "members made it known that they were against the female applicants by making comments such as women wanted to take control and 'run the lodge.'" Members also made numerous lewd, derogatory and profane comments about and to the petitioners. The superior court expressly relied upon all of these findings to affirm the commission's conclusion that the Lodge discriminated against the petitioners because of their gender. Accordingly, we need not decide whether the rule in *Thorpe* applies to statutory discrimination actions because the compensatory damages in this case were awarded for harm caused by the Lodge's intentional misconduct, and thus *Thorpe* is inapplicable.

## IV

Finally, the Lodge argues that Part I, Article 20 of our State Constitution limits each petitioner to $1,500 in compensatory damages because the Lodge was denied its constitutional right to a jury trial. While the legislature subsequently amended the public accommodations statute to provide a party the option of seeking a trial by jury, *see* RSA 354-A:21-a (Supp. 2002), the statute in effect during the relevant time frame provided no such option. The Lodge contends that because the petitioners were compensated for emotional harm, damages that "are only recoverable where the [d]efendant's conduct is tortious," it was entitled under our State Constitution to have had a jury resolve the discrimination claim.

Part I, Article 20 of our State Constitution provides:

> In all controversies concerning property, and in all suits between 2 or more persons except those in which another practice is and has been customary and except those in which the value in controversy does not exceed $1,500 and no title to real estate is involved, the parties have a right to a trial by jury. This method of procedure shall be held sacred unless, in cases arising on the high seas and in cases relating to mariners' wages, the legislature shall think it necessary to alter it.

This constitutional provision extends the right to a trial by jury "to all cases for which the right existed when the constitution was adopted in 1784," but not "to special, statutory or summary proceedings unknown to the common law." *Opinion of the Justices (SLAPP Suit Procedure)*, 138 N.H. 445, 450 (1994) (quotation omitted).

To resolve whether a party has a right to trial by jury in a particular action, we generally look to both "the nature of the case and the relief sought," *Employers Assurance Co. v. Tibbetts*, 96 N.H. 296, 298 (1950), and ascertain whether the customary practice included a trial by jury before 1784, *see id.* When a plaintiff seeks relief for breach of codified rights, we further consider the comprehensive nature of the statutory framework to determine whether the jury trial right extends to the action. *See Hallahan v. Riley*, 94 N.H. 338, 340 (1947) (elaborate procedure for administrative and judicial review provided by unemployment compensation statute militates against any implication of a trial by jury).

In this case, the trial court concluded that discrimination suits were excepted from the constitutional right to jury trial, ruling that the customary practice of pursuing such claims rested with the Human Rights Commission. *See* RSA 354-A:21 (Supp. 2002). The Lodge counters that it was entitled to a jury trial because the relief awarded is tortious in nature

and thus recoverable at common law. It rests its argument upon the similarity between compensatory damages awarded to a tort victim and compensatory damages awarded the petitioners for emotional harm suffered as a result of unlawful discrimination. While the nature of relief sought may be determinative of the right to a jury trial when parties dispute whether a claim is equitable or legal in nature, no such dispute exists here. *See Lakeman v. LaFrance*, 102 N.H. 300, 304 (1959) (parties disputed whether defendant entitled to jury trial to resolve statute of limitations issue); *Smith v. Manchester Management Corp.*, 117 N.H. 361, 362 (1977) (parties disputed whether defendant entitled to jury trial to resolve mismanagement of partnership affairs issue subsumed within equitable claim). *But see Employers Assurance Co.*, 96 N.H. at 298 (whether declaratory judgment action is legal or equitable "commonly considered to depend upon the nature of the claim or issue presented").

Focusing solely upon the nature of the damages, the Lodge fails to address whether unlawful gender discrimination, the right remedied in this case, was recognized at common law in 1784 and customarily resolved by jury trial. Furthermore, it makes no effort to appraise the seemingly comprehensive nature of the public accommodations law, and instead relies upon the bald assertion that "[s]tatutes that are remed[ial] in nature such as [workers'] compensation and unemployment security are distinguishable." Without adequate appellate argument, we decline to address the Lodge's argument any further. *See Douglas v. Douglas*, 143 N.H. 419, 429 (1999). Therefore, the trial court's conclusion that "the customary practice of bringing discrimination suits before the Human Rights Commission provides an exception to the right to a jury trial provided in [P]art I, [A]rticle 20" stands unchallenged.

*Affirmed.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.