Strafford
No. 2007-920

## HAIR EXCITEMENT, INC.

v.

## L'OREAL U.S.A., INC.

Argued: November 12, 2008
Opinion Issued: February 19, 2009

*Shaines & McEachern, P.A.*, of Portsmouth (*Robert A. Shaines* and *Laurie A. Lacoste* on the brief, and *Mr. Shaines* orally), for the plaintiff.

*Nixon Peabody, LLP*, of Manchester (*W. Scott O'Connell* and *David W. Ruoff* on the brief, and *Mr. O'Connell* orally), for the defendant.

BRODERICK, C.J. The plaintiff, Hair Excitement, Inc. (Hair Excitement), appeals from a judgment entered by the Superior Court (*Houran, J.*) rejecting its claim that the defendant violated the Consumer Protection Act, RSA chapter 358-A (1995 & Supp. 2008). The defendant, L'Oreal U.S.A., Inc., (L'Oreal) cross-appeals. We affirm.

I

The record supports the following facts. Hair Excitement is a New Hampshire corporation which owns and operates a number of hair salons in

New Hampshire, Maine and Massachusetts. L'Oreal manufactures and distributes hair care products, including Matrix and Redken brand products.

In 1993, Hair Excitement entered into purchase contracts with a Matrix distributor for the purchase of Matrix products, a line now owned by L'Oreal, for its salons. The contracts provided that Hair Excitement would "not resell or redistribute Matrix retail products to anyone other than [its] legitimate salon clients for home maintenance use." Either party could terminate the contracts "immediately upon notice."

In 1997, Hair Excitement entered into a Redken Products Chain Account Agreement (chain account agreement) with Redken Laboratories, Inc., a subsidiary of L'Oreal. Pursuant to this agreement, Hair Excitement was appointed "as an authorized, non-exclusive Redken Chain Account for the Redken products." The products to be sold under the account were either products that Hair Excitement could only sell to consumers for their own use or products that its professionals applied on clients at its salons. The chain account agreement provided that Hair Excitement would "sell the products . . . solely from Chain Account's salons to consumers for their own use, and that it [would] not sell, offer for sale or otherwise transfer such products to anyone other than consumers for their own use." As for products labeled "For Professional Use Only," the agreement provides that Hair Excitement would "use such products only in [its] salons." The agreement also provided that "[e]ither party may terminate this Agreement at any time, with or without cause, by giving sixty (60) days prior written notice of such termination to the other party."

These provisions restricting the sale of L'Oreal's products are intended to serve as protection against the sale of products outside of salons in the so-called "gray market." The "gray market" is a market in which legal but perhaps unethical methods are used to avoid a manufacturer's distribution chain and thereby sell goods at prices lower than those envisioned by the manufacturer. As the trial court's order explains:

> The diversion of product, and in particular product designed and marketed for salon-only sales, is a very large problem in the beauty industry. Manufacturers are constantly battling this problem, which harms the business reputations of both the manufacturer and the salon owner, which creates a mistaken impression that the manufacturer permits or endorses the sale of salon-only products outside of a professional salon setting, and which is likely to cause confusion concerning the quality of salon-only products. Among the few tools available to manufacturers to battle diversion are tips from informants, coding of product to track the product's distribution routes, and buying programs, known at L'Oreal as

"loyalty tests." Buying programs or loyalty tests involve the manufacturer sending in an investigator to pose as someone other than a consumer purchasing for the consumer's own use, and are generally used by a manufacturer to confirm whether a salon reported to be reselling in violation of contracts is in fact doing so. Both the problem and the tools used by manufacturers to combat it are well known and well understood by those involved in the industry.

In December 2001, a distributor in Rhode Island informed Charles Domroe, L'Oreal's director of corporate security, that it had learned from at least two sources that Hair Excitement was engaged in product diversion. As part of its subsequent investigation, L'Oreal retained Paul Cosentino to pose as a "collector" in order to conduct a "loyalty test" to determine whether Hair Excitement would make an unauthorized sale of L'Oreal's products. In early January 2002, Cosentino, posing as Paul Kostanza, telephoned Hair Excitement's salon in Rochester seeking to purchase Redken and Matrix hair care products for resale. That same day he received a return call from John Langlois, the owner of Hair Excitement, and was directed to contact purchasing manager, Ed Sharon, to discuss the proposed sale. Langlois knew that Cosentino intended to resell the products. The next day Cosentino spoke by telephone with Sharon and confided that he planned to sell the Redken and Matrix products outside of the United States. Sharon agreed to sell the requested products but told Cosentino that he needed to "be careful because Hair Excitement, Inc. [was] a franchise" and it "could run into problems with the manufacturer." The following day, Cosentino arrived at the Rochester salon and purchased 150 bottles of consumer-use only Redken and Matrix products at fifty percent of their retail value. Cosentino was told that Hair Excitement could supply whatever additional products he needed.

By letter dated February 8, 2002, L'Oreal informed Hair Excitement that due to its alleged product diversion and based upon other independent investigation, it was terminating the chain account agreement and would no longer sell it any Redken products. L'Oreal also barred its distributors from further sales of any of its product brands, including Matrix products, to Hair Excitement.

## II

Hair Excitement brought suit against L'Oreal alleging that it had violated RSA chapter 358-A. It contended that L'Oreal willfully and knowingly misrepresented the identity of its agent and also misrepresented the agent's intent with the purpose to deceive and induce it to sell the products to third parties in violation of its purchase contracts and chain

account agreement, resulting in its termination as an approved franchise. L'Oreal brought a counterclaim alleging that Hair Excitement violated RSA chapter 358-A because its distribution of Redken products outside of the salon-only sales to consumers harmed Redken's business reputation with both salon owners and consumers, created a mistaken impression that L'Oreal permits or endorses the sale of Redken products outside of a professional salon setting, and was likely to cause confusion concerning the quality of Redken products.

The parties agreed to bifurcate the trial of liability and damages. Over Hair Excitement's objection, the case was tried to the court and not to a jury. Following a four-and-a-half-day trial, the trial court found in favor of L'Oreal on Hair Excitement's claim and in favor of Hair Excitement on L'Oreal's counterclaim. This appeal followed.

Hair Excitement argues that the trial court erred in finding that: (1) it was not entitled to a jury trial; (2) L'Oreal did not engage in unfair and deceptive acts under RSA chapter 358-A; (3) L'Oreal's anti-diversion policy contained in the distributor contracts is a legitimate business practice; and (4) L'Oreal did not engage in price fixing. L'Oreal's cross-appeal raises four issues, including whether the trial court erred in ruling that: (1) the choice of law provision in the contract was inapplicable; (2) Hair Excitement's claims are not barred by the economic loss doctrine; (3) Hair Excitement's claims may not be limited by the terms of the contract; and (4) the doctrine of unclean hands does not bar Hair Excitement's claims. L'Oreal does not appeal the trial court's ruling in favor of Hair Excitement on L'Oreal's RSA chapter 358-A counterclaim. Accordingly, because we affirm the trial court's ruling in favor of L'Oreal on Hair Excitement's consumer protection claim, we need not address the issues raised by L'Oreal's cross-appeal. For purposes of this appeal, we assume without deciding that RSA chapter 358-A applies.

### III

Prior to trial, L'Oreal moved to strike Hair Excitement's jury trial demand. The trial court granted the motion on the basis that "there is neither a constitutional nor statutory right to a jury trial on a claim brought under RSA 358-A:10." Noting that it "has the discretion to seek the advice of a jury on such a claim," the court declined to exercise such discretion.

Part I, Article 20 of the New Hampshire Constitution provides:

In all controversies concerning property, and in all suits between two or more persons except those in which another practice is and

has been customary and except those in which the value in controversy does not exceed $1,500 and no title to real estate is involved, the parties have a right to a trial by jury. This method of procedure shall be held sacred, unless, in cases arising on the high seas and in cases relating to mariners' wages, the legislature shall think it necessary to alter it.

■ The right to a jury trial under the New Hampshire Constitution "is not without limitation; it extends only to those cases for which the jury trial right existed when the constitution was adopted in 1784." *State v. Morrill*, 123 N.H. 707, 712 (1983); *see Hallahan v. Riley*, 94 N.H. 338, 339 (1947) (constitutional guaranty of trial by jury in civil matters determined generally by historical test of its use at common law). Part I, Article 20 "did not create or establish a right [to a jury trial] not before existing. It was a recognition of an existing right, guaranteeing it as it then stood and was practiced, guarding it against repeal, infringement, or undue trammel by legislative action, but not extending it so as to include what had not before been within its benefits." *Davis v. Dyer*, 62 N.H. 231, 235 (1882). "The right does not extend . . . to special, statutory or summary proceedings unknown to the common law." *In re Sandra H.*, 150 N.H. 634, 636 (2004).

■ "To resolve whether a party has a right to trial by jury in a particular action, we generally look to both the nature of the case and the relief sought, and ascertain whether the customary practice included a trial by jury before 1784." *Franklin Lodge of Elks v. Marcoux*, 149 N.H. 581, 591 (2003) (quotation and citation omitted). "When a plaintiff seeks relief for breach of codified rights, we further consider the comprehensive nature of the statutory framework to determine whether the jury trial right extends to the action." *Id.*

■ The legislature enacted RSA chapter 358-A in 1970 to "ensure an equitable relationship between consumers and persons engaged in business." *Hughes v. DiSalvo*, 143 N.H. 576, 578 (1999). RSA chapter 358-A is "a comprehensive statute designed to regulate business practices for consumer protection by making it unlawful for persons engaged in trade or commerce to use various methods of unfair competition and deceptive business practices." *Chase v. Dorais*, 122 N.H. 600, 601 (1982). Thus, RSA chapter 358-A creates new statutory rights which did not exist in New Hampshire common law in 1784 when this state adopted its constitution. Because of this, our constitution does not confer the right to a jury trial for a claim under RSA chapter 358-A. *See Morrill*, 123 N.H. at 713.

■ Moreover, nothing in the language of RSA chapter 358-A specifically provides for a right to a jury trial. The statute states that:

> Any person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as *the court* deems necessary and proper. If *the court* finds for the plaintiff, recovery shall be in the amount of actual damages or $1,000, whichever is greater. If *the court* finds that the use of the method of competition or the act or practice was a willful or knowing violation of this chapter, *it* shall award as much as 3 times, but not less than 2 times, such amount. In addition, a prevailing plaintiff shall be awarded the costs of the suit and reasonable attorney's fees, as determined by *the court*. . . . Injunctive relief shall be available to private individuals under this chapter without bond, subject to the discretion of *the court*.

RSA 358-A:10, I (emphases added). We are the final arbiter of the meaning of a statute as expressed by the words of the statute itself. *Green Crow Corp. v. Town of New Ipswich*, 157 N.H. 344, 346 (2008). We look to the plain and ordinary meaning of the words used in the statute and will not examine legislative history unless the statutory language is ambiguous, consider what the legislature might have said, or add words not included in the statute. *Id.* In its ordinary meaning, the word "court" refers to a judge rather than a jury. Had the legislature intended to provide for a jury trial, it could have expressly done so. *See, e.g.*, RSA 354-A:21-a, I (Supp. 2008) (in action for damages based upon unlawful discrimination "either party is entitled to a trial by jury on any issue of fact"). Accordingly, under the plain language of the statute, the court is vested with the authority to decide claims brought under RSA chapter 358-A.

■■ Nonetheless, Hair Excitement argues that its claim is similar to a common law fraud or deceit claim. "In order to prove deceit, the plaintiff must prove that the defendant intentionally made material false statements to the plaintiff, which the defendant knew to be false or which he had no knowledge or belief were true, for the purpose of causing, and which does cause, the plaintiff reasonably to rely to his detriment." *Caledonia, Inc. v. Trainor*, 123 N.H. 116, 124 (1983). Fraud must be proved by clear and convincing evidence. *Id.* In contrast, to prove a violation of RSA chapter 358-A, a plaintiff must prove that the defendant is a person, that the defendant used an unfair method of competition or a deceptive act or practice, that the act occurred in trade or commerce, and that the defendant's conduct rose to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."

*ACAS Acquisitions v. Hobert*, 155 N.H. 381, 402 (2007); *see* RSA 358-A:2. In addition, RSA chapter 358-A provides broader damages than a common law fraud action, allowing treble damages, attorney's fees and costs. *See* RSA 358-A:10, I. Thus, actions brought pursuant to RSA chapter 358-A require proof of significantly different elements and satisfaction of a different standard of proof. Accordingly, we decline to hold that RSA chapter 358-A is analogous to common law fraud or deceit.

We affirm the trial court's ruling that RSA chapter 358-A claims are not entitled to a trial by jury. Although Hair Excitement argues that many RSA chapter 358-A claims have been tried before juries, we note that the issue of whether a right to a jury trial existed was never raised or addressed in those cases. *See, e.g., Becksted v. Nadeau*, 155 N.H. 615 (2007); *Transmedia Restaurant Co. v. Devereaux*, 149 N.H. 454 (2003).

Hair Excitement next argues that the trial court erred in finding that L'Oreal did not engage in unfair and deceptive acts under RSA chapter 358-A, asserting that many of its requests for findings of fact granted by the court support such a finding and that some of its requests denied by the court constitute error and are contrary to the evidence. When reviewing a trial court's decision, we will "sustain [its] findings and rulings . . . unless they are lacking in evidential support or tainted by error of law." *In the Matter of Letendre & Letendre*, 149 N.H. 31, 34 (2002). "Absent an unsustainable exercise of discretion, we will not overturn its ruling or set aside its factual findings." *Id.*

■ RSA 358-A:2 states that it "shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." Unfair methods of competition or unfair or deceptive acts or practices include "[c]ausing likelihood of confusion or of misunderstanding as to affiliation, connection or association with . . . another." RSA 358-A:2, III. Not all conduct in the course of trade or commerce falls within the scope of the statute. To recover under RSA chapter 358-A, a plaintiff must show that the defendant's acts attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Hobert*, 155 N.H. at 402. "[S]elfish bargaining and business dealings will not be enough to justify a claim for damages under the Consumer Protection Act." *Barrows v. Boles*, 141 N.H. 382, 390 (1996) (quotation omitted).

Although the trial court found that Mr. Cosentino misrepresented both his identification and intent in approaching Hair Excitement, it also found that those misrepresentations did not constitute a violation of RSA chapter 358-A. As the trial court noted, "Given this state of the beauty supply industry, L'Oreal did what is well understood in the industry and what

made sense to do in this case: It charged an investigator with approaching Hair Excitement to find out if [it] would sell a quantity of Redken and Matrix product." The trial court ruled that:

> L'Oreal's conduct was not immoral, unethical, oppressive, or unscrupulous, did not offend public policy as established by law or by other established concepts of unfairness, was not the type proscribed by the Consumer Protection Act, and did not attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce. L'Oreal was instead, in the context of a rough and tumble business, exercising its rights under the Hair Excitement agreements. Hair Excitement has fallen far short of its burden of proving that L'Oreal engaged in an unfair or deceptive act or practice in violation of the Consumer Protection Act.

■ There is sufficient evidence in the record to support these findings. The anti-diversion provisions in the contracts and chain account agreement entered into by the parties are included by L'Oreal to protect its brand name, trade name, and other intellectual property rights for its salon-only products such as Redken and Matrix. Such contractual terms are common in the industry. Anti-diversion campaigns are prominently advertised in trade shows, training seminars and trade publications. The beauty supply industry enforces its anti-diversion policies by terminating its contractual relationships with distributors, chain accounts, or salons that are caught engaging in diversion. L'Oreal publicizes the fact that it polices salons and distributors, has a zero-tolerance policy for diversion, and cancels contracts with salons and distributors that engage in diversion. Hair Excitement was aware of the practices of diversion, the gray market, and efforts by the industry to police and curtail it. We hold that the trial court's ruling that L'Oreal did not engage in unfair and deceptive acts under RSA chapter 358-A is not an unsustainable exercise of discretion.

■ The third issue raised by Hair Excitement is whether the trial court erred in finding that L'Oreal's anti-diversion policy contained in its distributor contracts is a legitimate business practice. Hair Excitement's position is that the policy violates the "first sale" doctrine under which a trademark owner cannot control distribution of a trademarked item beyond its first sale. Section 106(3) of the Copyright Act of 1976, 17 U.S.C. § 106(3) (2000), gives the owner of a copyright the exclusive right to distribute copies of a copyrighted work. "After the first sale of a copyrighted item . . . , any subsequent purchaser . . . is . . . an owner of that item." *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 145 (1998)

(quotations omitted). Pursuant to federal law, "such an owner is entitled, without the authority of the copyright owner, to sell that item." *Id.* (quotation omitted). The "first sale" doctrine is a defense to an infringement action under federal copyright law. Hair Excitement's cause of action was limited to a single theory of recovery: a violation of RSA chapter 358-A. We reject its "first sale" argument and hold that the doctrine has no application to this Consumer Protection Act claim.

▄▄▄ Finally, Hair Excitement argues that the trial court erred in finding that L'Oreal did not engage in price fixing. Hair Excitement argues that the evidence "in toto" shows that L'Oreal's conduct surrounding its termination of the chain account agreement supports that L'Oreal engaged in "price fixing" by preventing Hair Excitement from purchasing L'Oreal's products and selling them at discount prices. As the trial court found, L'Oreal did not need a pretext to terminate its contracts with Hair Excitement. The chain account agreement permitted unilateral termination without cause with sixty-day notice and the purchase contracts could be terminated by either party without cause or notice. Notwithstanding that the contracts could be terminated without cause, Hair Excitement in fact breached the express prohibitions against reselling Matrix products to anyone "other than [its] legitimate salon clients for home maintenance use" and against reselling Redken products to anyone "other than consumers for their own use," thereby giving L'Oreal cause to terminate them. We affirm the trial court's ruling that the evidence does not "reasonably support" a conclusion that L'Oreal deceived Hair Excitement into selling product with an underlying purpose of illegal price control.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.