Department of Employment Security
No. 2002-003

APPEAL OF KERRY TENNIS
(New Hampshire Department of Employment Security)

Argued: November 6, 2002
Opinion Issued: January 27, 2003

*New Hampshire Legal Assistance*, of Claremont and Portsmouth (*Jonathan P. Baird* and *Alan Linder* on the brief, and *Mr. Baird* orally), for the petitioner.

*Philip T. McLaughlin*, attorney general (*Mary E. Schwarzer*, assistant attorney general, on the brief and orally), for the respondent.

DUGGAN, J. The plaintiff, Kerry Tennis, appeals the decision of the New Hampshire Department of Employment Security (DES) that he is ineligible for unemployment benefits as of April 1, 2001. Tennis argues that the decision contravenes the statutory scheme for determining unemployment insurance, involves improper administrative rulemaking, and violates due process. We reverse.

Tennis worked for Compaq Computer Corp. (Compaq) for sixteen years. On March 27, 2000, Compaq notified him that his "last day of work" would be March 31, 2000. Tennis did not come to work, or perform any employment-related services for Compaq after the 31st. However, under the terms of Compaq's severance arrangement, Tennis continued to receive his regular biweekly pay and benefits until June 2, 2000, which Compaq called the "Termination Date." Tennis' pay during this period totaled $5,706. In June 2000, Tennis received a severance package totaling $17,118, as well as $3,804 in accumulated vacation pay. The post March 31 payments (severance pay) totaled $26,628.

Tennis initially filed for unemployment benefits on May 1, 2000. To obtain unemployment benefits, an applicant must meet two requirements relevant to this case. First, the applicant must be "totally unemployed" during the period for which he seeks benefits, meaning that "no wages are payable to him and . . . he performs no services" (the unemployment requirement). RSA 282-A:14, I (1999). Second, the applicant must have "earned not less than $1,400" in each of two calendar quarters in the base period preceding his application (the earnings requirement). RSA 282-A:25 (Supp. 2002).

As to Tennis' first application, DES prorated his severance pay over the forty-two weeks following March 31, 2000, by dividing the total severance pay by his weekly gross pay as of his last day of work. DES thus determined that Tennis would continue to receive "wages" as defined in RSA 282-A:14, III (1999) until January 20, 2001. Because he received wages from his employer, Tennis was not "totally unemployed" under RSA 282-A:14, and thus not eligible for benefits until after January 20, 2001. Tennis did not appeal this decision.

After January 20, 2001, Tennis, who was still unable to secure employment, reapplied for unemployment benefits. To obtain benefits, Tennis had to demonstrate that he earned at least $1,400 in two quarters of the relevant base period. *See* RSA 282-A:25. DES used the four quarters of 1999 as the base period for this application. Because Tennis had received payments and performed services for Compaq throughout this entire period, DES permitted him to receive unemployment benefits from January 20 to March 31, 2001.

On April 1, 2001, the statutory definition of "base period" and "benefit year" changed. *See* RSA 282-A:2, II (effective April 1, 2001); RSA 282-A:4 (effective April 1, 2001). Under the new definitions, Tennis had to reapply for benefits and demonstrate he met the two quarter earnings requirement in the year 2000. DES denied his reapplication because it determined that he had not "earned" income in two quarters of 2000. Specifically, it found that the severance payments received in the second quarter (April 1 to June 30, 2000) were not "earned" within the meaning of RSA 282-A:25 because Tennis did not perform services during the second quarter. Thus, DES concluded that Tennis had earned income in only the first quarter of 2000, and no longer met the earnings requirement for unemployment benefits.

After exhausting his administrative remedies, Tennis appealed to this court. He argues that the DES ruling that he must perform services in the second quarter to meet the earnings requirement has no basis in the law, involves improper fact-finding, constitutes an unwritten rule in contravention of the Administrative Procedures Act, and violates his right to due process of law. We agree that DES lacked statutory authority to impose this condition on the earnings requirement.

We have stated that:

> [I]nterpretation of a statute is a question of law, which we review *de novo*. The starting point in any statutory interpretation case is the language of the statute itself. Where the language of a particular statutory provision is at issue, we will focus on the statute as a whole, not on isolated words or phrases. We will not consider what the legislature might have said or add words that the legislature did not include.

*Crowley v. Frazier*, 147 N.H. 387, 389 (2001) (quotations and brackets omitted).

RSA 282-A:25 provides that an individual have "annual earnings, of which in each of the 2 calendar quarters [in the base period] the individual must have earned not less than $1,400" to receive benefits. The definition of "annual earnings" is "the wages . . . earned during each base period

from an employer by an individual in employment in New Hampshire." RSA 282-A:16 (1999). "Wages," for earnings requirement purposes, means "every form of remuneration for personal services paid or payable to a person directly or indirectly by his employing unit." RSA 282-A:15 (1999).

■ Tennis' severance pay clearly constitutes "wages" under RSA 282-A:15. Severance pay received from an employer is not gratuitous, but is connected to the services the employee provides prior to the employee's last day of work. *Cf. Milette v. N.H. Retirement System*, 141 N.H. 342, 345 (1996) (holding that post-termination severance pay may count as "earnable compensation" in determining retirement benefits); *Miller v. United States*, 362 F. Supp. 1242, 1244-46 (E.D. Tenn. 1973) (holding that post-termination severance pay may constitute income under 26 U.S.C. § 61 for federal taxation purposes). Thus, DES properly found that Tennis' severance pay was "attributable to services performed no later than March 31, 2000." DES also held that Tennis' second quarter wages were not "earned" under RSA 282-A:25 because Tennis did not perform services to merit them during that quarter.

■ Neither RSA 282-A:25 nor RSA 282-A:16, however, contain language that limits earnings to income received in the same quarter in which the employee performs services. Because our canons of statutory construction forbid us to "add words that the legislature did not include," we cannot infer such a requirement from the statutory unemployment scheme. *Crowley*, 147 N.H. at 389.

■ In addition, these statutes contain no provision similar to that in RSA 282-A:14, III, which states that "[w]ages or earnings or both shall be deemed to have been received for such week or weeks as the commissioner may find can be reasonably said to apply." The absence of a similar provision in RSA 282-A:25 indicates that the legislature did not intend to authorize DES to exercise similar discretion in determining earnings for RSA 282-A:25 purposes. The resolution of when an employee performed services to merit pay, however, inevitably involves discretion. For this reason, the date of services performed cannot be the touchstone for determining earnings under the statute. Instead, the statutory scheme indicates that the date of receipt, the determination of which does not involve discretion, is the proper method for determining earnings under RSA 282-A:25 in this case.

We also note that DES' interpretation of the statutory scheme would completely deny unemployment benefits to claimants in Tennis' position by permitting the agency to inconsistently attribute severance pay received after the last day of work. DES denied Tennis' first application

because it determined that he was not "unemployed" in the second quarter under the definition in RSA 282-A:14, I. In that decision DES used its discretion under RSA 282-A:14, III to prorate Tennis' severance pay over the forty-two weeks following his last day of work. Then, in the decision now before us, DES determined that Tennis had no "earnings" in the second quarter because it attributed the severance pay to the first quarter, the last period in which Tennis performed services. DES thus attributed the same pay both forwards and backwards.

DES argues that separate policy concerns underlying RSA 282-A:14 and RSA 282-A:25 justify and, indeed, mandate this result. According to DES, the definition of "wages" in RSA 282-A:14 is purposely broader than that of "earnings" in RSA 282-A:25 to prevent an applicant from "double-dipping" — that is, receiving unemployment benefits while at the same time receiving income from other sources. The purpose of RSA 282-A:25, conversely, is to limit benefits to applicants "regularly attached to the labor market." *See Wellman v. Riley,* 95 N.H. 507, 510 (1949). Thus, certain income may be attributed as "wages" to prevent an applicant from double-dipping, but not be attributed during the same period as "earned" income because the applicant was not attached to the labor market.

Assuming that these policy rationales underlie the current unemployment benefit statutes, we disagree that they support the DES decision in this case. Even if the initial determination to prorate Tennis' severance pay were necessary to prevent double-dipping, Tennis had some connection with the labor market during the second quarter. During this period, he continued to receive biweekly checks from Compaq, continued to accumulate vacation time, and continued to be listed as an employee by Compaq, which did not formally terminate him until June 2, 2000. DES itself admitted that Tennis "may have been an employee for certain purposes between March 31, 2000, and June 2, 2000." Thus, under the policy rationale advanced by DES, Tennis' severance pay qualified as "earned" income during the second quarter.

Finally, DES asks us to follow the decision in *Sorensen v. Meyer,* 370 N.W.2d 173 (Neb. 1985), which involved a similar statutory scheme. In *Sorensen,* the applicant received a lump sum severance payment in the first quarter of the year, which was also the last quarter in which the applicant performed services for his employer. *Sorensen,* 370 N.W.2d at 176. When the applicant initially filed for benefits in the second quarter of that year, the agency held him ineligible because it prorated the first quarter severance pay throughout that year. *Id.* The applicant filed again for benefits the following year. *Id.* To meet Nebraska's requirement that he have wages in each of two quarters, the applicant asked the agency to prorate his severance over the second quarter, as it had done in the first

decision. *Id.* at 177. The agency refused, and the Nebraska Supreme Court upheld its decision, citing the separate policies behind the two requirements for unemployment benefits. *Id.* at 178-79.

Unlike the applicant in *Sorensen*, Tennis received his final severance payments in the second quarter of the year, months after his last day of work. Tennis, thus, is not asking DES to prorate his severance pay, but only to attribute it to the quarter in which he actually received it. Nebraska's statutes, like ours, anticipate that income will be attributed to the period in which the employee receives it to determine earnings. *See id.* at 175-76 (quoting Nebraska's version of the earnings requirement, which states that "at least two hundred dollars shall have been *paid* in each of two quarters in his or her base period" (emphasis added)). Because our holding today does not conflict with Nebraska law on this point, we need not decide whether we would agree with the decision in *Sorensen. But see id.* at 179 (White, J., dissenting) (describing the agency's differing attributions of the severance pay as a "Catch-22").

Because DES imposed a requirement inconsistent with the unemployment statutes in determining whether Tennis met the earnings requirement, we reverse its decision, and remand for proceedings consistent with this opinion.

*Reversed and remanded.*

BROCK, C.J., and BRODERICK, NADEAU and DALIANIS, JJ., concurred.