Cheshire
No. 2006-224

ACAS ACQUISITIONS (PRECITECH) INC.

v.

STEPHEN C. HOBERT

Argued: February 27, 2007
Opinion Issued: May 3, 2007

*Orr & Reno, P.A.*, of Concord (*Martha Van Oot* on the brief and orally), for the plaintiff.

*Sheehan Phinney Bass & Green, P.A.*, of Manchester (*Edward A. Haffer* on the brief and orally), for the defendant.

GALWAY, J. The defendant, Stephen C. Hobert, appeals a decision of the Superior Court (*Sullivan,* J.) in favor of the plaintiff, ACAS Acquisitions (Precitech) Inc. (ACAS). We affirm.

The trial court found the following facts. In 1962, P. Donald Brehm founded Pneumo Precision (Pneumo) in Keene. The defendant joined Pneumo in 1982. In 1984, Brehm sold Pneumo to Allied Signal and started

Toolroom Craftsmen. The defendant remained employed by Pneumo. Eventually, Toolroom Craftsmen became Precitech. In 1994, Brehm hired the defendant as sales manager for Precitech, which, by that time, was competing directly with Pneumo. Each of these companies manufactured and sold ultra-precision single-point and multi-axis diamond turning, grinding, grooving and milling machine systems.

In 1997, Brehm sold Precitech to Schroeder Ventures, which, by that time, had acquired Pneumo. As part of this sale, Brehm executed an agreement whereby he remained employed by Precitech until October 14, 1999, and was subject to a three-year, non-competition agreement thereafter. That non-competition agreement prevented Brehm from competing with Precitech and from soliciting Precitech employees to engage in activities competitive with Precitech.

In 1998, the defendant left Precitech to be the director of sales at Optical Filter Corporation. He returned to Precitech in late 1999 as the Vice-President of Sales and Marketing. In November 1999, as a condition of his re-employment, the defendant executed an employment agreement with Precitech. That agreement contained provisions requiring the defendant to maintain Precitech's trade secrets and to refrain from competing with Precitech. Additionally, Precitech had a written confidentiality policy of which the defendant was aware.

In 2001, Patrick Hurst, who at one time was an engineer with Precitech, formed Novus Technologies, L.L.C. (Novus) to design and manufacture ultra-precision tools and equipment. In June 2001, Hurst partnered with Brehm to form Accura Technics, L.L.C. (Accura). Brehm was involved in the founding of Accura more than one year prior to the expiration of his non-competition agreement with Precitech. Sometime after the founding of Accura, Novus ceased operations. Hurst and Brehm testified that, had Novus remained operational, it could have produced products that would have been competitive with those of Precitech.

During the summer and fall of 2001, the defendant, along with others at Precitech, prepared a Confidential Information Memorandum (the Memo) which identified Precitech's key customers, marketing strategies and future business plans, as well as important product and financial information to be used by investment bankers in connection with a possible sale of Precitech. In early 2002, the defendant presented the Memo and other information to American Capital Strategies, a potential buyer of Precitech and the parent to ACAS.

In April or May 2002, the defendant met with Brehm and was told that Brehm and Hurst were developing a company and that if the defendant had any interest in joining them, he should call Hurst. A short time later, the defendant met with Hurst and Brehm to discuss marketing strategies

for Accura. Following this conversation, the defendant delivered a letter, dated May 30, 2002, to the office shared by Hurst and Brehm, which outlined potential marketing strategies for Accura. The trial court found that this letter clearly stated that the defendant intended to join Accura and that Accura would be in the business of manufacturing ultra-precision grinding machines competitive with those made by Precitech and would market those machines to Precitech customers. Moreover, the trial court noted that the defendant was aware of Precitech's interest in expanding into markets that he identified as potential markets for Accura and that the customers he identified to Accura were in such markets. Thus, the trial court found that the defendant, by aiding Accura, violated his 1999 employment agreement with Precitech.

In June 2002, ACAS purchased Precitech. In conjunction with that purchase, the defendant signed new employment, non-competition and non-disclosure agreements with ACAS. The new non-competition agreement states, in relevant part:

3. *Non-Competition; Non-Solicitation*

(a) While I am employed by [ACAS] and for a period of twenty-four (24) months after termination of my employment for any reason ..., I will not, whether alone or as a partner, officer, director, consultant, agent, employee or stockholder of any company or other commercial enterprise, directly or indirectly, engage in any line of business that represents at least 5% of the gross revenues of [ACAS] or any line of business which, to my knowledge was to be entered into and was planned by [ACAS] at any time during the period of my employment with [ACAS] ....

....

(c) While I am employed by [ACAS] and for a period of twenty-four (24) months after termination of my employment for any reason ..., I will not, directly or indirectly, solicit, entice or induce (i) any Customer ... of [ACAS] to become a Customer of any other person or entity engaged in a Competitive Line or (ii) any Customer or Supplier ... to cease doing business with [ACAS] in a Competitive Line, and I will not assist any person or entity in taking any action described in the forgoing clauses (i) and (ii).

The non-disclosure agreement provides, in pertinent part:

1. Nondisclosure and Use of Proprietary Information

> (a) I will not at any time, whether during or after the termination of my employment, reveal to any person or entity any of the trade secrets or proprietary or confidential information of [ACAS] or of any third party which [ACAS] is under an obligation to keep confidential ... or other materials of any nature relating to any matter within the scope of the business of [ACAS] or concerning any of the dealings or affairs of [ACAS] ..., except as may be required in the ordinary course of performing my duties as an employee of [ACAS].

Additionally, under the terms of the defendant's employment agreement, ACAS could terminate him at any time with or without cause, or he could terminate his employment upon sixty days' notice. Further, the defendant negotiated a unique severance package, which provided that if he were terminated without cause within the first year he would be entitled to severance payments equal to twelve months' pay and a portion of his incentive bonus. If, however, he had been terminated for cause as defined in his employment agreement, he forfeited any right to severance pay. In addition to negotiating this severance package, the defendant was permitted to "cash out" the stock he owned in Precitech at the closing. Neither this severance package nor the "cash out" benefit was made available to any other officer or employee of Precitech.

In late 2002, ACAS and Brehm began corresponding because ACAS was concerned that Brehm might be violating his non-competition agreement. The trial court found that when responding to ACAS' correspondence, Brehm misled ACAS regarding his involvement in Novus and Accura, his intent to develop high-precision grinding and turning machines and his belief that Accura would not compete with ACAS. The trial court found that although Brehm testified that Accura would not compete with ACAS because Accura would not develop machines capable of the degree of precision attainable by ACAS machines, "all the documentary evidence establishes clearly that prior to this litigation commencing, Accura intended to compete in the ultra-precision field."

In August 2002, Accura began production of its 1210G machine. That same month, the defendant met with two different attorneys to obtain information about the enforceability of his non-competition agreement and his severance package. On October 14, 2002, Brehm's non-competition agreement expired, and within two months Accura had nearly completed its 1210G machine. Accura's website described the machine as capable of, among other things, super-precision grinding.

In December 2002, the defendant again wrote to Hurst about joining Accura. According to the trial court, this letter, among other things,

implied that the defendant understood that being employed by Accura within two years of leaving ACAS would violate his non-competition agreement, but after consulting with an attorney he believed the non-competition agreement might be negotiable. Thus, the defendant proposed that if he and Accura could reach an agreement on employment, he would attempt to negotiate being released from his agreements with ACAS.

Later in December 2002, officers of ACAS met to discuss terminating the defendant for performance reasons. On January 7, 2003, the defendant was terminated without cause. Two days later, he met with Hurst, and on January 12, he wrote a letter to Hurst outlining various marketing strategies for Accura's products. The trial court found that this letter made it clear that the defendant "intended to use his knowledge learned at Precitech to help Accura compete in the ultra-precision area." Further, the trial court found that "[t]he letter is a blatant indication that [the defendant] intended to violate his fiduciary obligations and obligations under his Employment Agreement and Non-Competition Agreement to Precitech."

On January 13, 2003, the defendant again met with an attorney to discuss his obligations under his agreements with ACAS. The trial court found that the defendant was not forthcoming with his attorney and did not provide his attorney with numerous documents indicating that Accura intended to compete with ACAS prior to the commencement of this suit.

On January 17, 2003, Accura hired the defendant as its director of sales. During the ensuing week, the defendant sent e-mails to numerous companies that included technical information and a company profile of Accura. Nearly all of the companies contacted had been identified in the Memo as customers or potential customers of ACAS. The trial court did not credit the defendant's testimony that the e-mails were sent in response to e-mails or telephone calls he had received. According to the trial court, the evidence "clearly indicates" that the initial communications came from the defendant.

Regarding the companies' machines, the trial court found that although Accura's basic 1210G machine did not compete with ACAS' machines, a customer could add components touted by Accura to the 1210G that would enable it to directly compete with ACAS' machines. Further, prior to this litigation, Accura promoted its 1210G machine as having capabilities comparable to those of ACAS' machines. In sum, the trial court found that Accura manufactured and promoted a machine capable of directly competing with machines made by ACAS. Additionally, the trial court found that the defendant, through the use of knowledge and information gained from ACAS, attempted to aid Accura in selling and distributing its competing machines.

As a result of the above findings, the trial court ruled that the defendant: (1) violated his non-competition and non-disclosure agreements with ACAS; (2) violated his fiduciary duties to ACAS; (3) violated the Uniform Trade Secrets Act, RSA chapter 350-B (1995); (4) was not liable for a civil conspiracy; (5) forfeited his right to severance benefits and had to return severance payments he had received; and (6) was liable for ACAS' attorney's fees. The trial court ruled against the defendant on his counterclaims for breach of contract, severance payments, and violation of the Consumer Protection Act (CPA), RSA chapter 358-A (1995 & Supp. 2006). The defendant appeals.

On appeal, the defendant argues that the trial court erred in ruling that: (1) he violated his non-competition agreement; (2) he violated his non-disclosure agreement; (3) he violated his fiduciary duties, misappropriated trade secrets and otherwise acted wrongfully toward ACAS; (4) he was not entitled to severance pay and related attorney's fees under the parties' agreement, RSA chapter 275 (1999 & Supp. 2006) and the CPA; (5) ACAS was entitled to terminate severance benefits for post-termination violations; (6) ACAS was entitled to its attorney's fees pursuant to the "prevailing party" provision of the non-competition agreement; and (7) the "prevailing party" provision was neither contrary to public policy nor an unreasonable restraint on trade. We address his arguments in turn.

We note first, however, that while the defendant mentions, in passing, the 1999 agreement he had with Precitech, he does not raise any arguments relative to it, nor does he challenge the trial court's determination that he violated it. Thus, we deem any arguments relative to this agreement waived. *See Colla v. Town of Hanover*, 153 N.H. 206, 210 (2006).

## I. Non-Competition Agreement

The defendant's primary argument on appeal is that the trial court erred in ruling that he violated his non-competition agreement because it found that ACAS and Accura were competitors. According to the defendant, the two companies were not competitors because they did not make competing products and did not avail themselves of the same markets; thus, any dealings he had with Accura did not violate his non-competition agreement.

We have stated that the law does not look with favor upon contracts in restraint of trade or competition. *Merrimack Valley Wood Prods. v. Near*, 152 N.H. 192, 197 (2005). Such contracts are to be narrowly construed. *Id.* Restrictive covenants are, however, valid and enforceable if the restraint is reasonable, given the particular circumstances of the case.

*Id.* A covenant's reasonableness is a matter of law for this court to decide. *Concord Orthopaedics Prof. Assoc. v. Forbes*, 142 N.H. 440, 443 (1997). We review the trial court's factual findings, however, for clear error. *Id.*

To determine whether a restrictive covenant ancillary to an employment contract is reasonable, we engage in a three-part inquiry: first, whether the restriction is greater than necessary to protect the legitimate interests of the employer; second, whether the restriction imposes an undue hardship upon the employee; and third, whether the restriction is injurious to the public interest. *Merrimack Valley*, 152 N.H. at 197. If any one of these questions is answered in the affirmative, the restriction in question is unreasonable and unenforceable. *Id.* In determining whether a restrictive covenant is reasonable, we will look to the time when the contract was made. *Technical Aid Corp. v. Allen*, 134 N.H. 1, 8 (1991).

The first step in determining the reasonableness of a given restraint is to determine whether the restraint was narrowly tailored to protect the employer's legitimate interests. *Merrimack Valley*, 152 N.H. at 197. Legitimate interests of an employer that may be protected from competition include: the employer's trade secrets that have been communicated to the employee during the course of employment; confidential information other than trade secrets communicated by the employer to the employee, such as information regarding a unique business method; an employee's special influence over the employer's customers, obtained during the course of employment; contacts developed during the employment; and the employer's development of goodwill and a positive image. *Nat'l Employment Serv. Corp. v. Olsten Staffing Serv.*, 145 N.H. 158, 160 (2000). Moreover, when an employee holds a position involving client contact, it is natural that some of the goodwill emanating from the client is directed to the employee rather than to the employer, and the employer has a legitimate interest in preventing its employees from appropriating this goodwill to its detriment. *Merrimack Valley*, 152 N.H. at 198.

The defendant argues that the restriction in his non-competition agreement was broader than necessary to protect ACAS' interests because it covered his activities with a company that made products that do not, and cannot, compete with ACAS' products. ACAS counters that Accura's 1210G machine, as designed, competed with its machines and, therefore, the companies were in competition.

The trial court found that prior to the commencement of this case, Accura, with the defendant's help, distributed promotional material informing potential customers that the 1210G had capabilities substantially

similar to those of machines manufactured by ACAS. According to the trial court, however, after this case was filed, Accura and the defendant "tried to argue that they were not intending to do what their letters and materials created prior to litigation clearly indicate they intended to do"— that is, to create a competing machine. Also, the trial court found that the potential customers solicited by Accura were customers or potential customers of ACAS. The trial court found, based upon the evidence and testimony presented, that Accura and the defendant were attempting to compete in a market occupied by ACAS and that only the institution of this suit prevented such competition.

Not only did the trial court determine that Accura intended to develop a machine capable of competing with ACAS' machines and that it sought to retain ACAS' customers, but also that Accura's 1210G machine was, in fact, competitive. The trial court found:

> [T]he basic 1210G has applications that do not compete with Precitech machines, but ... at the time Precitech hired [the defendant in June 2002], Accura and [the defendant] both intended to also sell the 1210G for uses and in market[s] directly competitive with Precitech's machines. Also, by simply adding components touted by Accura, a customer can buy an Accura machine that is directly competitive with a Precitech machine.

The trial court further found that the 1210G was capable of tasks that would directly compete with ACAS' machines.

The defendant contends that the trial court's findings were contrary to the weight of the evidence and thus clearly erroneous. Specifically, he argues that the 1210G machine was not capable of the levels of precision of ACAS' machines and that its lower precision machines were geared to the "conventional tool room" market, a market distinct from any that ACAS occupied or planned to occupy. We disagree.

The trial court heard the testimony of David Davis, president and CEO of Precitech and ACAS from 1998 until 2004. Davis testified that the promotional materials distributed by Accura described a machine capable of the levels of precision attained by ACAS' machines. According to Davis, while some advertised aspects of the 1210G posed no problem, other attributes of the machine were "unusual" for a machine intended for the "conventional tool room" market and indicated that the machine was intended to compete with at least some of ACAS' machines. Furthermore, Davis testified that Accura and the defendant were soliciting customers who were not in the "conventional tool room" market. Instead, Accura was soliciting customers in the glass grinding and optics market, a market which required machines of greater precision than those in the

"conventional tool room" market, and a market which ACAS occupied and in which it sought to expand its market share. In response, the defendant offered his own testimony, as well as that of Hurst and Brehm, that Accura's machines could not compete with ACAS' machines and that Accura was not pursuing the same markets as those occupied by ACAS.

Following this testimony, Michael Janish, the current president of ACAS, testified similarly to Davis regarding Accura's and ACAS' machines. He testified that the comparisons made by the defendant were misleading because they compared ACAS' most accurate machines with the 1210G and did not take into account that ACAS sold less accurate machines with which the 1210G competed. Finally, Janish testified that some of the customers solicited by Accura and the defendant had no use for "conventional tool room" machines.

We defer to the trial court's determinations of credibility unless no reasonable person could have come to the same conclusion after weighing the testimony. *State v. Livingston*, 153 N.H. 399, 402 (2006). Here, the trial court chose to credit the testimony of Davis and Janish and not that of the defendant, Hurst and Brehm. After reviewing the record, we cannot say that no reasonable person would have come to the same conclusion.

■ According to the defendant, "Not once in the Court's 50-page Decree did it say a single word about the most critical evidence in the case"—that ACAS' machines were substantially more precise than Accura's and that they therefore served a different need in a different market. According to the defendant, "Not only was this evidence fully consistent with the testimony of Hobert and Accura's Brehm and Hurst—it demolished Precitech's core contention." Also, the defendant contends that even though the trial court did not mention this "critical evidence," it granted his related request for a finding on that issue, but did so with a mistaken qualification. He argues that this qualification revealed that "the Court evidently believed that the Accura product had a higher (and competitive) level of precision when Precitech brought suit, but had been changed to a lower level thereafter—a point that is absolutely contrary to uncontroverted evidence." Contrary to the defendant's contentions, however, the trial court specifically addressed the alleged differences in precision between the machines of each company and credited the testimony of Davis and Janish that the machines were competitive. Thus, we reject the defendant's contentions that the trial court did not properly weigh the evidence and uphold the trial court's finding that ACAS and Accura were competitors.

■ Having determined that ACAS and Accura were competitors, we next consider whether ACAS had legitimate interests that could be

protected through its non-competition agreement with the defendant. As noted above, legitimate interests of an employer that may be protected include trade secrets and other confidential information and an employee's contacts with, and special influence over, customers. Here, the defendant had served as the Vice-President of Sales for ACAS and in a similar capacity for Precitech. In those roles, he had nearly unfettered access to all of ACAS' trade secrets and confidential company information, and substantial contacts with and influence over customers and potential customers. Moreover, he had participated in the production of the Memo, a document outlining much of ACAS' company information, strategies and customers. Preventing the defendant from using this information and influence to the detriment of ACAS was certainly within its legitimate interests.

Next, we consider whether the defendant's non-competition agreement was narrowly tailored to protect ACAS' legitimate interests. *Merrimack Valley*, 152 N.H. at 197. As quoted above, the defendant's non-competition agreement prevented him from engaging in any line of business representing at least five percent of the gross revenues of ACAS or any line of business which, to his knowledge, was to be entered into and was planned by ACAS at any time during his employment with ACAS. Also, section 3(c) of the non-competition agreement prevented the defendant from soliciting ACAS' customers to become customers of a competitor and from aiding anyone else in actions that would violate the non-competition agreement.

In *Merrimack Valley*, we held that a restrictive covenant preventing an employee from doing business with any client who had transacted business with his employer in the previous year was too broad to protect the employer's interests because it covered numerous customers that the employee did not know and could not have known. *Id.* at 199. We noted that as to many of the employer's customers, the defendant was in no better position than a stranger. *Id.* We also noted that we had previously invalidated other non-competition agreements as too broad because they extended beyond the sphere of the employee's influence geographically, or beyond the scope of the employee's customer contacts. *Id.*

■ Here, unlike the situations discussed in *Merrimack Valley*, the defendant was in charge of marketing and sales for Precitech and later ACAS—companies that had or have, on a world-wide level, a large share of a relatively small market: the ultra-precision machine tool market. In this world-wide market, the defendant had contacts with many of the consumers and potential consumers of goods within the market. Also, the defendant had unfettered access to ACAS' technical, financial and

customer information. Therefore, the defendant was in a position to know the customers and lines of business that produced at least five percent of the gross revenues of ACAS. Additionally, he was in a position to know which markets and lines of business ACAS would enter and had planned to enter. This knowledge is demonstrated by the defendant's participation in the creation of the Memo, a document created only about a year prior to the defendant beginning negotiations with Accura which outlined the status of Precitech and the lines of business it planned to pursue with and through ACAS. Lastly, because of his position, the defendant was better able than any other person to solicit customers and to use customer information in aiding another entity in violating the agreement. We agree with the conclusion of the trial court:

> By reason of [the defendant's] intimate knowledge of Precitech's customer base, market trends and opportunities and pricing structure, [the defendant's] use and disclosure of this information to or for the benefit of Accura has caused, and will continue to cause Precitech irreparable injury through the loss of its good will and the usurpation of corporate opportunities identified to [the defendant] during his employment, an interest Precitech has the right to protect under New Hampshire law.

Accordingly, we conclude that the defendant's non-competition agreement, unlike the agreements discussed in *Merrimack Valley*, was not overly broad in its scope.

Secondly, the defendant's agreement prevented him from engaging in competitive lines of business for two years. In this case, no argument is made in the brief that the duration is unreasonable. "A covenant not to compete should last no longer than necessary for the employees' replacements to have a reasonable opportunity to demonstrate their effectiveness to customers." *Concord Orthopaedics*, 142 N.H. at 444 (quotation omitted). When evaluating duration, the court must consider the time necessary to obliterate in the minds of the public the association between the identity of the employee with his employer's business. *Id.* Here, the defendant had been involved in the sales of ultra-precision machine tools for many years and had served Precitech and ACAS in that position since 1994, except for the year he spent with Optical Filter Corporation. We conclude that allowing two years for the public to disassociate him from ACAS after his many years there, and for his replacements to demonstrate their effectiveness, was reasonable. Therefore, because we conclude that the defendant's non-competition

agreement was reasonable in both scope and duration, we also conclude that it was narrowly tailored to protect ACAS' legitimate interests.

The second factor in determining if the defendant's restrictive covenant is enforceable is whether its restrictions imposed an undue hardship upon him. *Merrimack Valley*, 152 N.H. at 197. The defendant argues, citing *Dunfey Realty Co. v. Enwright*, 101 N.H. 195 (1957), that the restriction imposed an undue hardship because it unnecessarily interfered with his following a trade or calling for which he was fitted and from which he may earn his livelihood, and because it precluded him from exercising the skill and general knowledge he had acquired. We disagree.

At the time the contract was made, the defendant understood that the covenant would force him to relocate. For this reason, the defendant negotiated a substantial severance package, both in value and duration, in exchange for signing the covenant. Restrictive covenants "not only inure to the benefit of the employer but to the employee as well, in that the latter may, by giving a restrictive covenant, be able to place himself in a more advantageous position economically." *Id.* at 198. Under these circumstances, where the defendant negotiated a substantial severance package in exchange for decreasing the sting of the restrictive covenant and with the full understanding that he might need to relocate, we cannot say that the covenant unnecessarily interfered with his ability to follow a particular trade or from using the skills and knowledge he had obtained. Therefore, we conclude that the agreement did not impose an undue hardship upon him.

Finally, in determining whether the restrictive covenant was reasonable, we look to whether the restriction was injurious to the public interest. *Merrimack Valley*, 152 N.H. at 197. The defendant contends that because free and fair competition is protected by Part I, Article 83 of the New Hampshire Constitution, he had a right to work for Accura and to bring to that work the skill and general knowledge he obtained while with Precitech and ACAS. The trial court found that "[n]either Accura nor [the defendant] can reasonably argue that enjoining [the defendant] from competing in the limited competitive lines or from usurping corporate opportunities identified to him by Precitech for a period of two years, unreasonably limits the public's right to choose." We agree. Nothing in the record leads to the conclusion that preventing the defendant from engaging in competitive business lines in any way injured the public interest. Accordingly, we conclude that the defendant's non-competition covenant was reasonable and enforceable.

Because we have concluded that the trial court's factual findings that Accura and ACAS made competing products and operated in competitive

markets are supported by the evidence, and because we have held that the defendant's agreement is valid and enforceable, we uphold the trial court's determination that by aiding Accura, the defendant violated his non-competition agreement with ACAS.

The defendant raises what he describes as "secondary points" regarding his non-competition agreement, which we address briefly. He contends that because Accura had not, as of the institution of this litigation, sold a single product, Accura did not compete with ACAS. ACAS was not, however, required to stand idly by while Accura and the defendant worked to compete with its products. Moreover, under section 3(c) of the agreement, the defendant was prevented from assisting another entity to engage in activities forbidden by the non-competition agreement. Thus, the defendant could violate the agreement by aiding Accura, regardless of whether Accura sold a single product.

Next, the defendant argues that Precitech and ACAS never planned to enter the "conventional tool room" market and, therefore, he did not violate the portion of the agreement requiring him to abstain from entering any line of business that was planned to be entered into by ACAS during his employment there. As discussed above, however, Accura's promotional materials and the contacts delivered to Accura by the defendant indicated that Accura was entering a line of business that was directly competitive with ACAS. We therefore reject the defendant's argument.

Finally, the defendant contends that ACAS' grinding system did not produce five percent of its gross revenues, and, therefore, he did not violate his agreement not to engage in any line of business representing at least five percent of ACAS' gross revenues. Davis testified, however, that in the years preceding the institution of this suit, grinding systems had accounted for nearly fifteen percent of ACAS' gross revenues. The trial court was within its discretion to credit this testimony.

Accordingly, we uphold the trial court's rulings that the non-competition agreement is valid and that the defendant violated its terms.

## II. Non-Disclosure Agreement

The defendant next contends that he did not violate his non-disclosure agreement because: (1) the three-part test applied to non-competition agreements also applies to non-disclosure agreements and this agreement fails that test; (2) ACAS and Accura were not competitors; and (3) the information he provided to Accura was readily ascertainable from public sources.

While we have never expressly stated that the three-part test applicable to non-competition agreements applies to non-disclosure agreements, for

purposes of this opinion we will assume that it does. As stated above, this test requires us to determine whether the restriction is greater than necessary to protect the legitimate interests of the employer, whether the restriction imposes an undue hardship upon the employee, and whether the restriction is injurious to the public interest. *Merrimack Valley*, 152 N.H. at 197.

The defendant's non-disclosure agreement provides that he may not reveal any of the trade secrets or proprietary or confidential information of ACAS or of any third party to which ACAS has an obligation to keep confidential, "except as may be required in the ordinary course of performing [his] duties as an employee of [ACAS]."

The first step is to determine whether this agreement was narrowly tailored to protect ACAS' legitimate interests. As noted previously, we conclude that ACAS had a legitimate interest in preventing its chief sales person from aiding in the marketing and sales of competitive products for a competitive business. "The employer has a legitimate interest in preventing its employees from appropriating [its] good will to its detriment." *Technical Aid*, 134 N.H. at 9.

Moreover, we conclude that this agreement was narrowly tailored to protect ACAS' legitimate interests. It specifically defined the information that the defendant could not disclose. By its terms, the defendant was prevented from revealing any information that ACAS had defined as "proprietary information." While "proprietary information" has a comprehensive definition under the agreement, it expressly does not include information in the public domain, information from third parties that can be disclosed without a breach of confidentiality obligations, information ACAS permits to be released, and any information that is required by a court or agency to be disclosed.

The definition of "proprietary information" and its exemptions make clear that the agreement covered only information that belonged to ACAS and that concerns the conduct of its business. Therefore, the agreement was narrowly tailored to protect ACAS' legitimate interests.

Second, the agreement did not impose an undue hardship upon the defendant. Under the agreement, the defendant was not permitted to reveal or use ACAS' proprietary information to aid another company, but he could use information in the public domain, information ACAS had released and other information from third parties that was not subject to confidentiality obligations. Because the defendant had spent a great deal of time in this industry, he was aware of the public sources of information on companies and individuals with interest in the products he was attempting to sell, and he did not need to rely upon the confidential

information of ACAS to earn a living. Therefore, the agreement did not impose an undue hardship upon him.

Third, the agreement is not injurious to the public interest. The defendant's agreement merely prevented him from using ACAS' proprietary information for his own gain or for the benefit of another person or entity. Permitting ACAS to protect its proprietary information did not in any way burden the public. Therefore, we conclude that the defendant's non-disclosure agreement was reasonable, valid and enforceable.

The defendant contends that ACAS and Accura were not competitors, and, therefore, ACAS suffered no detriment if any information was disclosed. As we have already concluded, however, ACAS and Accura developed and promoted competing products and functioned in competing markets.

Finally, the defendant argues that any information he disclosed to Accura was information available from public sources and, therefore, he did not violate the agreement. The trial court found:

> Some of the information [the defendant] disclosed to Accura and used on Accura's behalf was "readily ascertainable" from other sources. While the mere identity of customers for precision machinery systems may be readily ascertainable from other sources, the compiled customer information to which [the defendant] had constant and ready access included the ranking of customers by volume; the identification of customers by particular markets and/or particular Precitech products; the identification of customers who were likely prospects for products Precitech manufactured or developed; and the identification of customers who had purchased or would likely purchase "special" machines or who might partner with Precitech in the development of future products or markets. This information was set forth in the Confidential Information Memorandum and the SCH Contact.xls spreadsheet and the Business Overview [the defendant] provided to [his attorney], Brehm and Hurst.

The trial court recognized that while certain information the defendant disclosed to Accura was publicly available, some of the information he shared with Hurst and Brehm was not. Therefore, at least some of the information he divulged to Accura's principals was not in the public domain. Accordingly, for the above reasons, we conclude that the defendant's agreement was enforceable, that ACAS and Accura were competitors, and that the defendant disclosed ACAS' confidential

information to Accura. Thus, we uphold the trial court's ruling that the defendant violated his non-disclosure agreement.

## III. Fiduciary Duties, Misappropriating Trade Secrets and Other Wrongful Acts

The defendant's argument as to the trial court's rulings relative to his breach of fiduciary duties, misappropriation of trade secrets under RSA chapter 350-B, and other wrongful acts states, in its entirety:

> The facts on which Precitech claims that [the defendant] violated his restrictive covenants are also the facts on which it claims that he breached his fiduciary duty, misappropriated trade secrets, and otherwise acted wrongfully vis-à-vis Precitech. All of these latter claims also fail, for the reasons stated in Arguments I and II.

Because we agree with the trial court that the defendant violated his restrictive covenants and because the only basis upon which the defendant challenges the trial court's rulings is that he did not violate his covenants, we conclude that the trial court did not err.

## IV. Severance Pay and Related Attorney's Fees

Because the next two issues deal with the trial court's rulings on the defendant's entitlement to severance benefits and related attorney's fees, we address them together. The defendant contends that, contrary to the trial court's ruling, he is entitled to his full severance benefits under the parties' agreement, RSA chapter 275 and RSA chapter 358-A. He also argues that because ACAS willfully refused to pay his severance benefits, he is entitled to double or treble damages and attorney's fees. We address each argument in turn.

### A. The Parties' Agreement

Section 6(c) of the defendant's employment agreement provides, in relevant part:

> Upon termination of the [defendant's] employment hereunder (i) by the Company without Cause pursuant to Section 5(iv), or (ii) by the [defendant] for Good Reason pursuant to Section 5(v), the [defendant] shall be entitled to (i) his Base Salary for the Severance Period, payable in accordance with the usual payroll practices in effect at the Company, and (ii) a pro rata portion of [the defendant's] Incentive Bonus, if any, for the applicable

period during any calendar year [the defendant] was employed by the Company . . . .

Under section 6(d) of the agreement, the defendant is not entitled to severance if he is terminated for cause. "Cause" is defined in the parties' agreement, in part, as "a material breach of the [defendant's] obligations in connection with his or her Service or of a confidentiality, non-competition or other similar agreement, if any, with the Company." Also, the agreement provides that its provisions governing severance and the non-competition and non-disclosure agreements survive the defendant's termination.

ACAS acknowledges that on January 7, 2003, it dismissed the defendant without cause and, because it terminated him without cause, it began paying his severance benefits. Also, ACAS admits that on January 31, 2003, it suspended the defendant's severance payments. ACAS argues that it was entitled to do so because it discovered the defendant's dealings with Accura, Hurst and Brehm, which violated his non-competition and non-disclosure agreements. ACAS contends that had it known of those violations prior to the defendant's termination without cause, it would have terminated him for cause. Essentially, ACAS argues that its evidence of the defendant's pre-termination violations is a defense to its obligation to pay severance benefits, though this evidence was not obtained until after his termination. We agree.

"The interpretation of a contract is a question of law, which we review *de novo*." *Barclay Square Condo. Owners' Assoc. v. Grenier*, 153 N.H. 514, 517 (2006). Also, "[w]hether after-acquired evidence may limit damages or completely bar liability is a question of law reviewable *de novo* by this court." *McDill v. Environamics Corp.*, 144 N.H. 635, 640 (2000).

 "[I]n a breach of contract action after-acquired evidence of employee misconduct is a defense to a breach of contract action for wages and benefits lost as a result of discharge if the employer can demonstrate that it would have fired that employee had it known of the misconduct." *Id.* at 641 (quotation omitted). Under the terms of the parties' agreements, the defendant forfeited his right to severance payments if he violated his non-competition or non-disclosure agreements. Here, ACAS contends, and the trial court found, that had ACAS known of the defendant's violations prior to his termination without cause, it would have terminated him for cause. Therefore, although ACAS did not learn of the defendant's violations until after his termination, we conclude that under the terms of the parties' agreements, ACAS was justified in terminating the defendant's severance payments for his pre-termination violations.

The defendant acknowledges this understanding of the parties' agreement when, in his brief, he states: "[I]f [the defendant] had violated his Non-Competition Agreement *while he was employed* by the Company, he could have been terminated 'for cause' on that basis. Similarly, [he] could have had a 'without cause' termination changed to a 'for cause' termination after the fact—but *only* if he had violated his covenant *pre*-termination." The defendant contends that he did not work for Accura until after his termination by ACAS.

The trial court found, however, that the defendant "engaged in a calculated series of moves to help Brehm and Hurst set up a competitive business through identification of corporate opportunities, disclosure of confidential information, advice regarding marketing and solicitation of Precitech customers so that Accura would be poised to enter the market upon expiration of Brehm's non-competition agreement and [the defendant's] 'extracation' [*sic*] from his own contractual and fiduciary obligations . . . ." Because there is evidence in the record to support these findings, we conclude that the defendant was not entitled to severance under the terms of the parties' contract.

Finally, we note that the trial court ruled that ACAS was entitled to recover the $6,132.29 in severance payments it made before suspending them. The defendant makes no separate challenge to that ruling, and it is, therefore, affirmed.

### B. RSA chapter 275

The defendant contends that his severance benefits are wages as defined in RSA chapter 275 and that ACAS' failure to pay them is a violation of the statute. Also, the defendant contends that because ACAS' refusal to pay is willful and without good cause he is entitled to recover increased damages, costs and attorney's fees.

Interpretation of a statute is a question of law, which we review *de novo*. *Appeal of Tennis*, 149 N.H. 91, 93 (2003). Also, while we defer to the trial court's factual findings, provided there is evidence in the record to support them, we review its application of the law to the facts *de novo*. *Saviano v. Director, N.H. Div. of Motor Vehicles*, 151 N.H. 315, 318 (2004).

RSA 275:44, I, requires that "Whenever an employer discharges an employee, the employer shall pay the employee's wages in full within 72 hours." If, however, "an employer willfully and without good cause fails to pay an employee's wages . . . , such employer shall be additionally liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day . . . such failure continues . . . ." RSA 275:44, IV. RSA 275:42, III defines "wages" as:

compensation, including hourly health and welfare, and pension fund contributions required pursuant to a health and welfare trust agreement, pension fund trust agreement, collective bargaining agreement, or other agreement adopted for the benefit of an employee and agreed to by his employer, for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation.

Under RSA 275:43, III, "Vacation pay, severance pay, personal days, holiday pay, sick pay and payment of employee expenses, when such benefits are a matter of employment practice or policy, or both, shall be considered wages pursuant to RSA 275:42, III, when due."

The trial court found that, "Severance benefits were not a 'matter of practice or policy' at Precitech, and are therefore not 'wages' as defined by RSA 275:42, III or RSA 275:43." According to the trial court, "Only a few key management employees were offered employment contracts by ACAS in connection with its acquisition of Precitech, and the severance benefits were negotiated individually with each management employee." We agree with the trial court that because severance benefits were offered only in connection with the sale of Precitech and only then to a few employees on terms negotiated individually with those employees, granting severance benefits was not a matter of practice or policy at ACAS. Therefore, we conclude that the defendant's severance benefits do not meet the definition of wages in RSA 275:42, III and RSA 275:43, III.

Additionally, the trial court found that the defendant's severance benefits were not wages because they "were not 'compensation ... for labor or services rendered,' but rather, consideration for his agreement not to compete with Precitech if he was terminated without cause or voluntarily resigned." Such a finding, although not necessary to the determination of the issue, serves to reinforce the conclusion that not only are the defendant's severance benefits not wages, they were not intended by the parties to be treated as wages. Accordingly, we uphold the trial court's conclusion that the defendant's severance benefits are not wages under RSA chapter 275. Because we hold that the defendant's severance benefits are not wages, ACAS did not violate RSA chapter 275 in refusing to pay them.

*C. RSA chapter 358-A*

The defendant contends that ACAS' refusal to pay his severance benefits qualifies as an unfair act or practice under RSA 358-A:2. Also, the defendant contends that because ACAS' refusal was willful and knowing,

he is entitled to double or treble damages as well as costs and attorney's fees.

RSA 358-A:2 states that it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." "Trade" and "commerce," in turn, are defined as "the advertising, offering for sale, sale, or distribution of any services and any property . . ., and shall include any trade or commerce directly or indirectly affecting the people of this state." RSA 358-A:1, II. RSA 358-A:2 provides a non-exhaustive list of acts and practices that are unlawful. Finally, RSA 358-A:10 permits any person injured by an unfair act or practice to bring a private action for damages and to recover enhanced damages for that injury.

The defendant does not argue that ACAS violated any of the enumerated provisions of the CPA. Therefore, we must determine whether ACAS' actions fit within the statute's general prohibition on unfair and deceptive acts. In making our determination, the trial court's findings of fact and rulings of law will be upheld unless they lack evidentiary support or constitute clear error of law. *Milford Lumber Co. v. RCB Realty*, 147 N.H. 15, 19 (2001).

We have recognized that the general provision of the CPA is broadly worded, and not all conduct in the course of trade or commerce falls within its scope. *State v. Moran*, 151 N.H. 450, 452 (2004). In determining which commercial actions, not specifically delineated, are covered by the act, we have employed the "rascality" test. *See Barrows v. Boles*, 141 N.H. 382, 390 (1996). Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce. *Moran*, 151 N.H. at 452.

 Here, the trial court found that RSA 358-A:2 did not apply to the conduct of ACAS in this case. We agree. ACAS suspended the defendant's severance payments based upon its reasonable belief that he had violated his restrictive covenants. This conduct is not of the same type as that proscribed by the CPA. Moreover, suspending benefits until its obligation to pay them is established does not raise an eyebrow of one inured to the rough and tumble of the world of commerce. Accordingly, we uphold the trial court's conclusion that the defendant is not entitled to recovery under the CPA. For the above reasons we conclude that the defendant was not entitled to severance benefits under the parties' agreement, RSA chapter 275 or the CPA.

## V. *"Prevailing Party" Provision*

Because the final two arguments raised by the defendant concern the enforceability and operation of the "prevailing party" provision of his non-competition agreement, we address them together. The defendant contends that the "prevailing party" provision of his non-competition agreement, which allows the party prevailing at trial to collect its attorney's fees, is contrary to public policy because it is a contract of adhesion and a chilling and unreasonable restraint on alternative employment. Moreover, the defendant contends that the trial court erred in awarding ACAS its attorney's fees under this provision. We address each argument in turn.

### A. *Enforceability of the Provision*

Section 5 of the defendant's non-competition agreement states, in relevant part, "The prevailing party in any litigation arising under this Agreement shall be entitled to recover his or its attorneys' fees and expenses in addition to all other available remedies." As noted, the defendant contends that this provision is not enforceable because it is a contract of adhesion and because it is an unreasonable restraint on alternative employment.

As to his argument regarding adhesion, although the defendant raised the issue in his notice of appeal, he failed to brief it. Therefore, the issue is deemed waived. *In the Matter of Jasper-O'Neil & O'Neil,* 149 N.H. 87, 91 (2003).

Regarding his second argument, the defendant contends that this provision is contrary to New Hampshire public policy "as a chilling and unreasonable restraint on alternative employment." According to the defendant, the disparity in bargaining power between the employer and the employee requires that an employer only be permitted to recover attorney's fees in a "flagrant case." The defendant argues that this is a "close case," and that the provision should not be enforced because "[o]therwise, no one in such an employee's position would run the risk of losing at trial, even if he firmly and reasonably believed that his new job would not be competitive with his old one."

 While the defendant contends that enforcing such a provision in a close case would be unreasonable because it would impose a hardship on employees, that logic does not apply here. The defendant's non-competition agreement provides that:

> I [the defendant] will have the right, at any time during the non-competition period, to provide written notice to [ACAS]

> containing all the details of any proposed business activity on my part and [ACAS] shall respond within 15 days of such notice with its opinion as to whether such proposed business activity violates any obligation in this Section 3(a).

Thus, the defendant had the right under his contract to obtain ACAS' opinion as to whether he was violating his non-competition agreement. Had he done so, and had ACAS stated that it believed his interactions with Accura would not violate the agreement, he might have been able to claim that he had a "firmly and reasonably" held belief that he was not competing. Because the defendant had the contractual right to ACAS' opinion and because he did not avail himself of that right, we do not agree that enforcing the "prevailing party" provision is unreasonable because he believed he was not competing.

### B. Award of Fees

The defendant contends that the trial court erred in awarding ACAS its attorney's fees because: (1) he did not violate his non-competition and non-disclosure agreements; and (2) the trial ought to have been confined to his counterclaims and ACAS should not have been seeking its fees. As to the first argument, for the reasons stated above, we agree with the trial court that the defendant violated his non-competition and non-disclosure agreements.

Regarding the defendant's second contention, he argues that, because the trial court granted ACAS' request for a preliminary injunction, because after that ruling he amended his answer to state that he would not violate his non-competition and non-disclosure agreements by working for Accura, and because he stated that he would agree to an order stating that he would not work for Accura, there was no need for a trial to enforce his obligations under his agreements. In essence, he argues that the granting of the injunction and his agreement not to work for Accura rendered ACAS' claims moot. We disagree.

The defendant had, by aiding Accura prior to his termination, violated his non-competition and non-disclosure agreements prior to accepting the position at Accura. Thus, regardless of his agreement not to work for Accura, ACAS was justified in pursuing its claim that he had violated his agreements. Also, even if he did not continue to work for Accura, ACAS still sought a ruling that it was justified in suspending his severance payments due to his violation of his agreements. Thus, ACAS' claims were not moot and it was justified in pursuing them. Because ACAS was justified in pursuing its claims, and because it prevailed on those claims,

the trial court did not err by awarding ACAS its attorney's fees under the terms of the parties' contract.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.